

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Andrés Whittenburg<br><br>Peticionario<br><br>v.<br><br>Iglesia Católica Apostólica Romana de Puerto Rico, Colegio Nuestra Señora del Carmen<br><br>Recurridos | Certiorari<br><br>2011 TSPR 137<br><br>182 DPR _____ |

Número del Caso: CC - 2008 - 517

Fecha: 26 de septiembre de 2011

Tribunal de Apelaciones:

Región de Arecibo/Fajardo/Aibonito Panel IX

Jueza Ponente:

Hon. Yvonne Feliciano Acevedo

Abogado de la Parte Peticionaria:

Lcdo. Gaspar Martínez Mangual

Abogado de la Parte Recurrida:

Lcda. Mayra v. Rodríguez Zayas

Materia: Despido Injustificado, Violación Reserva de Empleo; ACAA; Proceso Sumario

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Andrés Whittenburg
      Peticionario

                                            *Certiorari*

            v.                          CC-2008-517

Iglesia    Católica    Apostólica
Romana  de  Puerto  Rico,  Colegio
Nuestra Señora del Carmen
            Recurridos


Opinión del Tribunal emitida por la Jueza Asociada señora Fiol Matta


En San Juan, Puerto Rico, a 26 de septiembre de 2011.

Hoy debemos resolver, en primer lugar, si un maestro contratado por tiempo definido por una escuela privada es realmente un empleado contratado por tiempo indefinido sujeto a las protecciones de la Ley de Despido Injustificado. En segunda instancia, analizaremos si la persona así contratada tiene derecho a la reserva de empleo que provee la Ley de Protección Social por Accidentes de Automóviles. Por entender que los hechos en este caso demuestran que el peticionario era un empleado por tiempo indefinido, que la Ley de Protección Social por Accidentes de Automóviles brinda protección a una amplia gama de empleados

independientemente de la relación obrero-patronal y que el empleado fue despedido mientras estaba vigente el periodo de reserva dispuesto por dicha ley, revocamos.

I.

En el 2001, el peticionario, Andres Whittenburg, comenzó a trabajar como maestro de educación física en el Colegio Nuestra Señora del Carmen, institución académica de la que es egresado. El contrato de empleo del señor Whittenburg, que se denominó como "Contrato de Servicios Profesionales",[1] estableció una compensación de $12,760 anuales que nombró salario. El contrato, además, proveía para deducciones de seguro social, contribuciones y otras dispuestas por ley.[2] También se estableció un horario fijo de trabajo, de 7:45am a 2:45pm, y se requirió al maestro que firmara diariamente una hoja de asistencia y estuviese disponible para participar en actividades curriculares y extracurriculares. Según el contrato, el señor Whittenburg no podía ausentarse de su trabajo durante horas laborables excepto si mediaba justa causa y se notificaba previamente a la gerencia del Colegio para que autorizara la ausencia.[3] Además del salario, el patrono concedía un mes de vacaciones anualmente,[4] y el maestro acumulaba un día y

---

[1] *Véase* Contrato de Servicios Profesionales, p. 27 del Apéndice, Petición de *certiorari*. El contrato es uno de adhesión, con ciertos espacios en blanco en donde se escribe la información específica del maestro contratado.

[2] *Íd.*, p. 28.

[3] *Íd.*

[4] Este periodo podía ser junio o julio, según se acordara entre las partes.

medio de enfermedad mensualmente hasta un total de quince días.[5]

El Contrato incluía una cláusula que daba una vida nominal al mismo de un año y otorgaba al Colegio la libertad para decidir si sería renovado.[6] No obstante, el primer semestre de la relación contractual se concibió expresamente como un periodo probatorio,[7] lo cual indica que el propio contrato contemplaba que la relación de trabajo entre el señor Whittenburg y el Colegio tendría una duración mayor.

La relación entre el Colegio y el señor Whittenburg no era exclusiva de éste. Por el contrario, era la realidad

---

[5] Si no utilizaba los días de enfermedad, los mismos serían liquidados. Si se excedía de los días de enfermedad, se haría el correspondiente descuento del sueldo en el mes que correspondiera.

[6] La Cláusula número 15 del Contrato expone que el mismo "expirará a su vencimiento y sólo podrá ser renovado, a opción de el [sic] COLEGIO, en forma expresa y por escrito y bajo los términos y condiciones que el COLEGIO lo [sic] tenga bien a establecer." Íd., p. 30. No obstante, el expediente demuestra que entre los periodos de vigencia del Contrato de Servicios Profesionales, el señor Whittenburg continuó trabajando por periodos mayores de 90 días antes de que se firmara el nuevo contrato que renovaba la relación entre las partes. Véase Determinación de Hecho número 2 del Tribunal de Primera Instancia, pp. 65-66 del Apéndice, Petición de certiorari.

[7] La Cláusula número 13 del Contrato lee así:

> En caso de que el/la maestro(a) esté en su PRIMER (1er.) año de contrato con el COLEGIO, el PRIMER (1er.) SEMESTRE escolar constituirá y se considerará como el período probatorio, al fin de cuyo período el COLEGIO podrá resolver y dar por terminada [sic] este CONTRATO DE SERVICIOS PROFESIONALES, si así lo estimare procedente.

Íd., p. 29. (Énfasis suplido). De lo anterior también se desprende que la relación entre las partes trascendería el año de duración del contrato.

laboral de <u>todos</u> los "empleados" del Colegio Nuestra Señora del Carmen.[8] Es decir, la totalidad de los trabajadores del Colegio, fuesen docentes, no-docentes o de mantenimiento, laboraban bajo un Contrato de Servicios Profesionales. Nominalmente, el Colegio no tenía empleados regulares por tiempo indefinido.

El 15 de junio de 2003, el señor Whittenburg sufrió un accidente de tránsito por el cual procuró y recibió tratamiento de la Administración de Compensación por Accidentes Automovilísticos (ACAA).[9] En ese momento, el señor Whittenburg estaba disfrutando del periodo mensual de vacaciones que proveía su contrato, a pesar de que éste tenía vigencia hasta el 13 de junio de 2003. La realidad es que el Colegio le pagaba al señor Whittenburg el sueldo mensual de junio y julio, como parte de la práctica de la escuela de mantener trabajando a los empleados bajo contrato <u>incluso durante periodos en que no había contrato firmado</u>, pues éste era "renovado" rutinariamente bastante entrado el próximo semestre académico.[10]

---

[8] Determinación de Hecho número 4 del Tribunal de Primera Instancia, pp. 66-67 del Apéndice, Petición de *certiorari*. El Padre Fernando Morell Domínguez, Director del Colegio, declaró que la práctica de tener a todos los empelados bajo contrato de servicios es común entre los Colegios Católicos. Transcripción del Juicio, p. 54; Apéndice de la Petición de *certiorari*, p. 154.

[9] No hay controversia de que se trata de un accidente no-ocupacional. A raíz del accidente, el peticionario experimentó una dislocación de la muñeca y una fractura radial en el brazo izquierdo. Por causa de las lesiones sufridas y dado que se acogió a los beneficios provistos por la Ley ACAA, recibió servicios de hospitalización y se sometió a una intervención quirúrgica.

[10] El Tribunal de Primera Instancia determinó que en el 2002, por ejemplo, el señor Whittenburg comenzó a trabajar

Según los propios demandados, entre junio y agosto de 2003, la gerencia del Colegio discutió si prescindirían de los servicios del señor Whittenburg, a pesar de que no había una evaluación desfavorable de su desempeño. El 4 de agosto de 2003, sin haberse recuperado completamente de sus heridas, el peticionario acudió al Colegio para participar en una serie de reuniones preparativas para el reinicio del semestre académico.[11] Allí se encontró con la Principal del Colegio, la señora Carmen Díaz Pérez, quien, al verlo con la mano vendada, le preguntó que cómo iba a trabajar de esa manera. Es decir, constató su inhabilidad para trabajar.[12] Acto seguido, el peticionario le informó que había tenido

---

el 8 de agosto, a pesar de que el contrato que había vencido en junio de ese año no fue renovado sino hasta 98 días después. *Véase* Determinación de Hecho número 2 del Tribunal de Primera Instancia, pp. 65-66 del Apéndice, Petición de *certiorari*. Véase además el testimonio de la señora Carmen Nydia Díaz Pérez, Principal del Colegio, quién declaró que la práctica era que los contratos se firmaban en noviembre, a pesar de que "comenzaban" a trabajar en agosto al reiniciarse el semestre académico. Transcripción del Juicio, p. 25.

[11] Esto a pesar de que muchos de los maestros allí presentes aún no habían firmado sus respectivos contratos de servicio, dada la práctica de renovación tardía del Colegio. Es decir, a pesar de haber vencido los contratos de servicios profesionales y no haberse renovado los mismos, los maestros se personaron para las reuniones de reinicio de clases, lo que denota una expectativa razonable de continuidad en sus puestos.

[12] No hay controversia de que el accidente de tránsito incapacitó temporeramente al señor Whittenburg, particularmente cuando se toma en cuenta que era un maestro de educación física. Sin embargo, del expediente no surge con claridad el momento preciso en que el Colegio se enteró del accidente de tránsito del peticionario. De lo que no cabe duda es que se enteró del mismo antes de comunicarle la decisión de despedirle, después de que éste se había personado a la ACAA y mientras recibía sus beneficios.

un accidente de tránsito.[13] Al otro día, la gerencia del Colegio Nuestra Señora del Carmen le informó al señor Whittenburg que prescindirían de sus servicios y que no le renovarían su contrato.[14]

El señor Whittenburg presentó una demanda por despido injustificado al amparo de la Ley número 80 de 30 de mayo de 1976, según enmendada, mejor conocida como la Ley de Despido Injustificado (en adelante Ley 80),[15] y por violación a la reserva de empleo establecida por la Ley número 138 de 26 de junio de 1968, según enmendada, mejor conocida como la Ley de Protección Social por Accidentes de Automóviles (en adelante Ley ACAA).[16] También reclamó daños y perjuicios.

El Tribunal de Primera Instancia determinó que el señor Whittenburg era un empleado regular que ocupaba la plaza de maestro de educación física del Colegio Nuestra

---

[13] Determinación de Hecho número 8 del Tribunal de Primera Instancia, pp. 67-68 del Apéndice, Petición de *certiorari*. No surge con claridad del expediente si en ese momento el señor Whittenburg informó a la principal de que se había acogido a los beneficios de la Ley ACAA.

[14] Precisamente, parte de la controversia es si estamos ante un caso en el que no se renovó el contrato o si estamos ante un despido. Si bien no se puede determinar con exactitud si en algún momento previo a la reunión el señor Whittenburg informó a la gerencia del Colegio que se había acogido a los beneficios de la ACAA, no hay controversia de que poco después de ser informado de que su contrato no sería renovado, le comunicó ese hecho. No obstante, la gerencia del Colegio insistió en su decisión.

[15] 29 L.P.R.A. §§ 185a *et seq.*

[16] 9 L.P.R.A. §§ 2051 *et seq.* La reserva de empleo está contemplada en la § 2054(3)(b). Originalmente, la demanda incluía, además del Colegio, a la Iglesia Católica. No obstante, el peticionario desistió de la causa de acción contra la Iglesia y el pleito se limitó únicamente a sus reclamaciones contra el Colegio.

Señora del Carmen y no un contratista independiente. El tribunal de instancia basó su determinación en el hecho de que el peticionario estuvo trabajando más de 90 días sin firmar contrato -lo que convertía dicho período en uno probatorio que al finalizar otorgó al peticionario la categoría de empleado regular-, en las deducciones que se hacían al salario del señor Whittenburg y en la información que proveía el Colegio al Departamento de Hacienda en la que identificaba al peticionario como empleado suyo. También determinó que el Colegio sabía que el señor Whittenburg recibía tratamiento en la ACAA al momento en que le informaron que había sido despedido. Además, el foro primario concluyó que la forma en que el Colegio se relacionaba con sus trabajadores era un esquema institucional para evadir las protecciones y obligaciones de la Ley 80. Esto, dado que todos los empleados de la escuela estaban "bajo contrato", a pesar de que ocupaban puestos, a todas luces, regulares.

Como secuela de lo anterior, el Tribunal de Primera Instancia declaró con lugar la demanda y ordenó la reinstalación del señor Whittenburg, condenando al demandado al pago de los salarios dejados de percibir y $20,000 por concepto de angustias mentales. De igual forma, otorgó al peticionario un 25% en honorarios de abogados. El foro primario no otorgó un remedio al amparo de la Ley 80 por entender que operaría la doble-compensación.

Inconforme, el Colegio acudió oportunamente al Tribunal de Apelaciones en donde alegó la comisión de

varios errores. En primer lugar, negó que el señor Whittenburg fuera empleado regular de la escuela y no un contratista. Como consecuencia, alegó que no existía una causa de acción por despido injustificado ni aplicaba la reserva bajo la Ley ACAA. Argumentando en la alternativa, adujo que, de entenderse que el señor Whittenburg era un empleado, únicamente tenía derecho al remedio de la mesada de la Ley 80. En tercer lugar, también argumentando en la alternativa, el Colegio impugnó la determinación del Tribunal de Primera Instancia en excluir prueba testifical en cuanto a los ingresos recibidos por el peticionario en otros empleos tras su despido y su relación con la cuantía a ser pagada. El foro de instancia había excluido tal prueba por entender que se había presentado tardíamente. Los demandados, por su parte, argumentaron que la prueba sobre los salarios devengados por el peticionario tras su despido son parte del remedio en derecho y no meramente de la cuantificación de los daños. Finalmente, el Colegio cuestionó la partida de $20,000 por angustias mentales dado que, a su entender, no se presentó evidencia de daños.

El foro apelativo revocó la Sentencia del Tribunal de Primera Instancia. Amparándose en la cláusula número 15 del Contrato suscrito entre el señor Whittenburg y el Colegio, que facultaba unilateralmente al Colegio a decidir si renovaba o no el mismo, el foro intermedio concluyó que se trataba de una contratación por tiempo cierto *bona fide* y que no había indicación de que se hubiese creado una expectativa de empleo. Por tanto, no aplicaba la Ley 80. En

cuanto a la reserva de la Ley ACAA, el Tribunal de Apelaciones determinó que, dado que el accidente ocurrió después de la fecha de vencimiento del último contrato entre las partes, ésta tampoco aplicaba. Finalmente, el tribunal apelativo revocó la partida de $20,000 otorgada al peticionario por angustias mentales, pues entendió que no se había presentado prueba al respecto.

El señor Whittenburg acude ante este Tribunal solicitando que revoquemos la determinación del Tribunal de Apelaciones y que restituyamos la Sentencia del Tribunal de Primera Instancia. En particular, argumenta que fue empleado regular del Colegio Nuestra Señora del Carmen, que fue despedido sin justa causa, que la reserva contemplada por la Ley ACAA aplica en su caso y que ante el foro primario se presentó prueba suficiente para apoyar la concesión de compensación por angustias mentales. Habiendo comparecido ambas partes, procedemos a resolver.

II.

No hay más que repasar nuestra Constitución para advertir la importancia del derecho al trabajo en nuestra sociedad, reconocimiento que surge del valor social del trabajo como elemento central de la vida en sociedad.[17] Esta realidad no solo fue reconocida por la Convención Constituyente sino que ha sido objeto de actuaciones

---

[17] Rivera Figueroa v. Fuller Brush, 2011 T.S.P.R 25, p. 8; Domínguez Castro v. E.L.A., 177 D.P.R. ___ (2010), 2010 T.S.P.R. 11, p. 82; García v. Aljoma, 162 D.P.R. 527, 582 (2004).Véase además Amy v. Adm. Deporte Hípico, 116 D.P.R. 414, 421 (1983).

legislativas a través de los años que han resultado en una política pública laboral que claramente protege los derechos de los trabajadores contra el capricho y abuso patronal. La piedra angular en el ordenamiento laboral resultante es, sin duda, el derecho al empleo, pues sin el derecho a retener el empleo poco sentido tendrían las demás protecciones asociadas al trabajo.[18] Es por eso que la Asamblea Legislativa aprobó, en 1976, la Ley 80, que, si bien no prohíbe absolutamente el despido de un empleado, castiga el despido que se hace sin justa causa.[19]

En su artículo 1, la Ley 80 establece que toda persona que sea empleado de comercio, industria o cualquier otro negocio o sitio de empleo, que sea contratada sin tiempo determinado y trabaje mediante remuneración de alguna clase, tendrá derecho a recibir de su patrono una indemnización, además del sueldo que hubiere devengado, si es despedido de su cargo sin que haya mediado justa causa. Es decir, la Ley 80 aplica a aquellos empleados de comercio, industria o cualquier otro negocio o sitio de empleo que: (1) estén contratados sin tiempo determinado; (2) reciban una remuneración; y (3) sean despedidos de su cargo, sin que haya mediado justa causa.[20] Esta compensación

_____

[18] Orsini v. Srio. de Hacienda, 177 D.P.R. ___ (2009), 2009 T.S.P.R. 190, pp. 21-22.

[19] 29 L.P.R.A. §§ 185a et seq.; Rivera Figueroa v. Fuller Brush, supra, p. 9.

[20] Orsini v. Srio Hacienda, supra, p. 19; García Burgos v. A.E.E.L.A., 170 D.P.R. 315, 322 (2007, Opinión de Conformidad del Juez Asociado Fuster Berlingeri); Charles Zeno Santiago & Víctor M. Bermúdez Pérez, Tratado de Derecho del Trabajo, T. I, J.T.S. (2003), p. 98. (Énfasis suplido).

se conoce como la mesada y su cuantía dependerá del tiempo durante el cual el empleado ocupó su puesto y del sueldo que devengaba.[21]

En cuanto a qué constituye justa causa para el despido, es importante recalcar que la Ley articula unos supuestos específicos en su artículo 2,[22] regulando así las circunstancias en las que un patrono puede despedir a un empleado. Por eso, como regla general, todo despido es injustificado a menos que responda a las excepciones establecidas en la propia Ley 80. Estas van desde ciertas conductas del empleado que son contrarias a los objetivos del puesto,[23] hasta situaciones relacionadas con la viabilidad de la empresa o el puesto ocupado por el empleado.[24]

A través de los años, hemos sido claros en que la Ley 80, como estatuto reparador, debe interpretarse

---

[21] 29 L.P.R.A. § 185a.

[22] 29 L.P.R.A. § 185b.

[23] Será justa causa para el despido: (1) que el obrero siga un patrón de conducta impropia o desordenada; (2) que el empleado no rinda su trabajo en forma eficiente o lo haga tardía y negligentemente o en violación de las normas de calidad del producto que se produce o maneja por el establecimiento; (3) que el empleado viole reiteradamente las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento, siempre que se le haya suministrado oportunamente copia escrita de los mismos.

[24] También será justa causa para el despido: (1) que surja el cierre total, temporero o parcial de las operaciones del establecimiento; (2) que sucedan cambios tecnológicos o de reorganización, cambios de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y cambios en los servicios rendidos al público; o (3) que se requieran reducciones en empleo debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido.

liberalmente a favor del trabajador, resolviéndose toda duda a favor del obrero.[25] De igual forma, las excepciones a su aplicación deben surgir expresamente del texto de la ley.[26] Es decir, "la exclusión de un empleado de los beneficios de la legislación laboral debe ser clara y debe interpretarse restrictivamente".[27] Esta norma de interpretación, que aplica tanto a la Ley 80 como a las demás protecciones laborales recogidas en diversas leyes especiales que discutiremos más adelante, surge del reconocimiento de que en Puerto Rico "ha sido política pública proteger en la medida posible los trabajadores, creando así un clima de armonía obrero-patronal indispensable para el progreso y bienestar de todos los sectores de la comunidad".[28]

No toda persona que trabaja como medio para sostenerse es un 'empleado' para efectos de la protección que ofrece la Ley 80.[29] Sin embargo, nuestras leyes protectoras del

---

[25] Irrizary v. J & J Cons. Prods. Co., Inc., 150 D.P.R. 155, 164 (2000); Cuevas v. Ethicon Div. J & J Prof. Co., 148 D.P.R. 839, 849 (1999); Belk v. Martínez, 146 D.P.R. 215, 232 (1998); Santiago v. Kodak Caribbean, Ltd., 129 D.P.R. 763, 771 (1992).

[26] García Burgos v. A.E.E.L.A., 170 D.P.R. 315, 323 (2007, Opinión de Conformidad del Juez Asociado Fuster Berlingeri). Véase además Martín Santos v. C.R.U.V., 89 D.P.R. 175, 186 (1963).

[27] López Vega v. F. Vega Otero, Inc., 103 D.P.R. 175, 177 (1974). (Énfasis suplido); López Santos v. Tribunal Superior, 99 D.P.R. 325, 330 (1975); Sierra Berdecía v. Pedro A. Pizá, Inc., 86 D.P.R. 447, 454 (1962).

[28] López Santos v. Tribunal Superior, 99 D.P.R. 325, 330 (1970).

[29] Cabe recalcar que con respecto a las clases de empleados que están cobijados por la ley, "ya hemos resuelto que, debido a que no limita el concepto 'empleado', la Ley Núm.

trabajo definen esta figura "en los términos más amplios posibles".[30] Con esto en mente, pasamos a analizar cómo hemos atendido la diferencia entre un "empleado" y un "contratista independiente".

La legislación protectora del derecho al trabajo sólo aplica a aquellas personas que están incluidas bajo la clasificación de empleado,[31] término que se ha definido como aquella "persona que rinde servicios a un patrono y a cambio recibe de éste un sueldo, salario, jornal, comisión, bono, adehala o cualquier otra forma de compensación".[32] Por otra parte estamos ante un "contratista" o "parte contratante", si "dada la naturaleza de su función y la forma en que presta servicios resulta ser su propio patrono".[33] A veces se hace difícil distinguir entre ambos conceptos,[34] y no debemos enfocarnos únicamente en el título que las partes en el contrato de trabajo le han dado a la

---

80, *supra*, aplica a ejecutivos, administradores y profesionales [pues] las prácticas que la ley pretende desalentar no conocen gradación por causa del tipo de empleado del que se trate". García Burgos v. A.E.E.L.A., *supra*, Opinión de Conformidad del Juez Asociado Fuster Berlingeri, pp. 322-323, 325. Es decir, protege a una amplia gama de trabajadores.

[30] Landrón v. J.R.T., 87 D.P.R. 94, 98 (1963).

[31] Alberto Acevedo Colom, Legislación Protectora del Trabajo Comentada, (8va. Ed. 2005), p. 7.

[32] *Íd.*, citando a Diccionario de Términos Jurídicos, Ignacio Rivera García, Equity Publishing Corporation, segunda Edición.

[33] *Íd.*, pp. 7-8.

[34] Nazario v. González, 101 D.P.R. 569, 572 (1973). "Son raras las ocasiones en que puede establecerse con certeza una tajante distinción entre el empleado y el contratista independiente".

relación entre ellos. Más bien se requiere ponderar las circunstancias en las que se lleva a cabo el trabajo.[35] En efecto, "no es el nombre con que se denomina un acto el que determina su contenido, sino su contenido, según éste surge de un análisis del mismo y de todas las circunstancias que lo rodean".[36]

Hemos identificado una serie de criterios que permiten distinguir entre empleados y contratistas *bona fide*. Éstos son:

(1) Naturaleza, extensión y grado de control que ejerce el patrono sobre la persona en la ejecución de la obra o trabajo;
(2) Grado de juicio o iniciativa que despliega la persona;
(3) Forma de compensación;
(4) Facultad de emplear y derecho a despedir obreros;
(5) Oportunidad de incurrir en ganancias y el riesgo de pérdidas;
(6) La titularidad del equipo y de las instalaciones físicas provistas por el principal;
(7) Retención de contribuciones;
(8) Si como cuestión de realidad económica la persona que presta el servicio depende de la empresa para la cual trabaja;
(9) Permanencia de la relación del trabajo;
(10) Si los servicios prestados son una parte integral del negocio del principal o se pueden considerar como un negocio separado o independiente por sí mismos.[37]

---

[35] Bengochea v. Ruiz Torres, 103 D.P.R. 68, 71 (1974); Sierra Berdecía v. Pedro A. Pizá, Inc., *supra*, p. 456.

[36] Pueblo v. Srio. de Justicia, 117 D.P.R. 230, 252 (1986).

[37] Alberto Acevedo Colom, Legislación Protectora del Trabajo Comentada (2005), pp. 9-10; Hernández v. TOLIC, 151 D.P.R. 759, 768 (2000); Fernández v. ATPR, 104 D.P.R. 464, 465 (1975).

Para precisar la naturaleza de la relación y determinar si está sujeta a los mandatos de las leyes protectoras del trabajo, es necesario considerar el conjunto de circunstancias en cada caso y hacer un análisis integrado de los criterios previamente mencionados.[38] Al aplicar lo anterior en el crisol de la política pública vigente,[39] nos hemos manifestado consistentemente a favor de la existencia de una relación empleado-patrono, particularmente si una decisión en dirección contraria hubiese desprovisto a un trabajador de la protección de nuestra legislación laboral.[40] Solamente cuando la relación de principal-contratista es evidente es que hemos optado por no aplicar la protección de la legislación laboral.[41]

Un ejemplo ilustrativo del proceso anteriormente descrito es nuestra decisión en Avon Products, Inc. v. Srio. del Trabajo.[42] Para determinar si unas vendedoras de casa en casa de Avon podían beneficiarse de la Ley de Seguridad de Empleo de Puerto Rico,[43] analizamos si éstas eran empleadas o contratistas de dicha compañía. A pesar de

---

[38] Véase Flores Roman v. Ramos González, 127 D.P.R. 601, 609 (1990).

[39] Nazario v. González, supra, p. 572.

[40] Sierra Berdecía v. Pedro A. Pizá, Inc., supra, p. 454. Véase además Hernández v. TOLIC, ante, Avon Products, Inc. v. Srio. del Trabajo, ante, Mariani v. Christy, 73 D.P.R. 782 (1952) y Atiles, Admor v. Comisión Industrial, 68 D.P.R. 115 (1948).

[41] Fernández v. ATPR, supra, caso de dueños de camiones.

[42] 105 D.P.R. 803 (1977).

[43] Ley 74 de 21 de junio de 1956, según enmendada, 29 L.P.R.A. §§ 701 et seq.

que estas trabajadoras no vendían los productos en los establecimientos comerciales de la compañía, no tenían horario fijo y tenían poca supervisión directa, determinamos que las vendedoras eran empleadas y no contratistas. Más recientemente, en Hernández v. TOLIC,[44] enfatizamos el elemento de la facultad que tiene la persona contratada para llevar a cabo su encomienda de manera verdaderamente independiente en contraposición al grado de control que tiene la persona que contrata y se beneficia de sus servicios. Igualmente, hicimos énfasis en el factor económico de la relación y la participación del trabajador en el riesgo de ganancia y pérdida que conlleva la actividad económica realizada.[45]

III.

Para resolver nuestra controversia, no es suficiente distinguir entre el contratista independiente y el empleado pues la Ley 80, a diferencia de la Ley ACAA como discutiremos más adelante, protege a empleados contratados sin tiempo determinado.

En nuestro sistema jurídico, hay dos maneras fundamentales mediante las cuales puede manifestarse la otorgación de un contrato laboral individual. Específicamente, los acuerdos laborales pueden ser otorgados: (1) por un periodo de tiempo indeterminado; o

---

[44] 151 D.P.R. 759 (2000).

[45] Íd., p. 767.

(2) para un tiempo fijo, o para un proyecto u obra cierta.[46]

Ahora bien, la propia Ley 80, además de diferenciar entre la figura del contratista y el empleado, también nos alerta a la posibilidad de que se utilicen contratos de empleo por tiempo fijo que no sean *bona fide* como un subterfugio para evadir las obligaciones de la Ley. Así, como corolario a la política pública que favorece la protección del empleo, el legislador condicionó la determinación de la existencia y validez de un contrato de empleo por tiempo determinado a que éste fuese *bona fide*:

> No obstante lo dispuesto en el primer párrafo de esta sección, el mero hecho de que un empleado preste servicios al amparo de un contrato por tiempo determinado por sí solo **no** tendrá el efecto automático de privarle de la protección de las secs. 185a a 185 de este título si la práctica y circunstancias involucradas u otra evidencia en la contratación fueran de tal naturaleza que tiendan a indicar la creación de una expectativa de continuidad en el empleo o aparentando ser un contrato de empleo por tiempo indeterminado bona fide. En estos casos los empleados así afectados se considerarán como si hubiesen sido contratados sin tiempo determinado. Excepto cuando se trate de empleados contratados por un término cierto *bona fide* o para un proyecto u obra cierta *bona fide*, toda separación, terminación o cesantía de empleados contratados por término cierto o proyecto u obra cierta, o la no renovación de su contrato, se presumirá que constituye un despido sin justa causa…[47]

Más adelante, la ley le impone al patrono la carga de alegar y probar la contratación *bona fide* a término cierto:

> [E]n toda acción entablada por un empleado reclamando los beneficios dispuestos por las secs. 185a a 185m de este título, cuando se trate

---

[46] Delgado Zayas, <u>Legislación Protectora del Trabajo</u>, *Op.Cit.*, pp. 22-23.

[47] <u>29 L.P.R.A. §185a</u>. (Énfasis suplido).

de que el empleado fue contratado por un <u>término cierto</u>, o para un proyecto o una obra cierta, el patrono vendrá obligado a alegar en su contestación a la demanda estos hechos <u>y a probar la existencia de un contrato bona fide</u> para entonces quedar eximido de cumplir con el remedio que disponen las secs. 185a a 185m de este título, salvo que el patrono pruebe que el despido fue justificado.[48]

Surge aquí la fuerte preocupación de la Asamblea Legislativa de que se utilice la figura del contrato por tiempo cierto como mecanismo para esquivar las protecciones de la Ley 80. Por eso, la propia ley establece unos criterios que sirven para determinar si, en efecto, estamos ante un contrato *bona fide* de este tipo o si, por el contrario, estamos ante un contrato sin tiempo determinado disfrazado como contrato por tiempo cierto. Nótese, además, que esta sección de la Ley 80 altera el peso de la prueba y establece así la presunción de que los empleados se contratan por término indefinido.[49] En última instancia, explica Acevedo Colom, "no debe prevalecer una interpretación restrictiva que pueda burlar la protección de la ley a una persona que de otra forma estaría protegida contra acciones caprichosas del patrono".[50]

De lo anterior se desprende que en aquellos casos donde el contrato sea por tiempo definido, existe una

---

[48] <u>29 L.P.R.A. § 185k(a)</u>. (Énfasis suplido).

[49] Delgado Zayas, <u>Legislación Protectora del Trabajo</u>, *Op.Cit.*, p. 21. Recientemente, en <u>Rivera Figueroa v. Fuller Brush</u>, *supra*, discutimos el efecto de las presunciones creadas por la Ley 80 que invierten el peso de la prueba contra el patrono.

[50] Acevedo Colom, <u>Legislación Protectora del Trabajo</u>, *Op.Cit.*, p. 183.

presunción de que éste no es *bona fide* y, por el contrario, que la persona así contratada es un empleado por tiempo indeterminado. Le corresponde al patrono presentar prueba que, mediante un estándar de preponderancia, derrote dicha presunción. Si el patrono no presenta prueba a esos efectos o si la misma es insuficiente para derrotar la presunción, ésta sobrevive, por lo cual estaremos ante un empleado por tiempo indeterminado. En ese caso, el despido o no renovación del contrato de empleo activa la presunción de despido injustificado y el caso de tramitará bajo la Ley 80. Cuando, por el contrario, el patrono presenta prueba suficiente para derrotar la presunción, el tribunal analizará si las circunstancias apuntan a que se generó una expectativa de continuidad en el empleo. Si el tribunal concluye que no hubo tal expectativa, estaremos ante un contrato por término fijo *bona fide* y no aplicará la Ley 80. Ahora bien, si se demuestra que se generó una expectativa de continuidad en el empleo, el tribunal concluirá que se trata de un empleado contratado por tiempo indeterminado. En ese caso, al igual que cuando no se derrota la presunción de que el contrato no es *bona fide*, el despido o la no renovación del contrato activa una presunción de despido injustificado y el caso se tramitará como cualquier controversia de despido injustificado bajo la Ley 80.

El examen de la intención legislativa al requerir prueba de contratación *bona fide* cuando se alegue un contrato por tiempo fijo confirma este análisis. Así lo

expresa la Asamblea Legislativa en la Exposición de Motivos
de la Ley 7 de 1 de marzo de 1988:

> La experiencia ha demostrado que algunos patronos en Puerto Rico han instituido la práctica de reclutar su personal a base de contratos vencederos mensual o anualmente, renovables o no a la voluntad del patrono, con el propósito de evadir el cumplimiento de la citada Ley Núm. 80. Se da el caso en tales situaciones, de empleados que permanecen prestando sus servicios de manera ininterrumpida durante un sinnúmero de años y un buen día son despedidos de sus empleos sin que medie causa justificada para ello y se ven privados de reclamar el amparo que provee la Ley Núm. 80.[51]

A partir de esta enmienda, como nos dice Delgado Zayas, "[l]a duración del contrato por término fijo va a depender […] de las necesidades de la empresa y de las circunstancias *bona fide* que lo justifiquen". Si el contrato por término fijo tiene el objetivo de "llevar a cabo funciones regulares y normales de una empresa, cuya duración o necesidad es de carácter indefinido, estaríamos ante un contrato por tiempo indefinido, que alguien ha denominado por término fijo más bien por error, capricho o como un subterfugio para violar la ley".[52] No hay duda, pues, que la contratación de trabajo por cierto término o

---

[51] Leyes de Puerto Rico, 1988, p. 50. La Asamblea Legislativa hace un llamado a que estemos pendiente por si la contratación a término fijo es *bona fide* "o si, por el contrario, se trata de una hábil estratagema diseñada para evadir las responsabilidades impuestas por dicha ley y, por ende, perjudicar los derechos del empleado". *Íd.*

[52] Delgado Zayas, Legislación Protectora del Trabajo, *Op.Cit.*, pp. 22-23.

para cierta obra, para propósitos de nuestra legislación laboral, es la excepción a la regla.[53]

El contrato a término fijo está recogido en el artículo 1473 del Código Civil bajo la figura del contrato de arrendamiento de obras o servicios.[54] Mediante este contrato, una de las partes se obliga a ejecutar una obra o a prestar a la otra un servicio a cambio de un precio cierto. Se trata de una relación contractual consensual, es decir, perfeccionada por el mero consentimiento, bilateral, pues crea obligaciones recíprocas, y onerosa.[55] En Puerto Rico, el recurso a esta figura del Código Civil se ha ido limitando, a medida que se ha ampliado el derecho laboral y el concepto del empleado por tiempo indeterminado. En particular, el ordenamiento laboral ha restringido la aplicación del principio de libertad de contratación del Código Civil[56] y en muchas ocasiones éste cede ante el interés estatal en regular las relaciones de trabajo: "La libertad de contratación […] no llega al extremo de permitirle al patrono esta violación a la política pública

---

[53] *Íd.*, p. 21.

[54] La figura del contrato de arrendamiento de servicios está esparcida entre los artículos 1473 y 1477 del Código Civil. 31 L.P.R.A. §§ 4111-4115.

[55] Soc. de Gananciales v. Vélez & Asoc., 145 D.P.R. 508, 517 (1998).

[56] "Los contratos pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarias a la ley, a la moral, ni al orden público". Artículo 1207 del Código Civil, 31 L.P.R.A. § 3372; véase Soc. de Gananciales v. Vélez & Asoc., *supra*, pp. 516-517.

ni a infringir la Ley 80, según enmendada".[57] Como consecuencia, "los contratos de servicios están regulados por las leyes que protegen los derechos de los trabajadores",[58] producto de una lectura restrictiva e integral de esta figura.[59] Estas disposiciones del Código Civil aplican únicamente a empleados de labranza, menestrales, artesanos y otros trabajadores asalariados que realicen labores similares.[60] Para los demás contratos de empleo por tiempo fijo o para obra cierta, siempre y cuando sean *bona fide* y no hayan generado una expectativa de continuidad, se recurrirá a la teoría general de las obligaciones y los contratos.[61] Si un empleado contratado de manera *bona fide* por tiempo fijo o para obra cierta es despedido sin justa causa mientras está vigente el término de su contrato, tendrá derecho al resarcimiento de los daños ocasionados por el quebrantamiento del contrato, los cuales se determinarán sobre la base de los salarios dejados de percibir por motivo del despido, más cualquier otro daño que pueda establecer.[62]

---

[57] Arthur Young & Co. v. Vega III, 136 D.P.R. 157, 169-170 (1994); Delgado Zayas, Legislación Protectora del Trabajo, *Op.Cit.*, p. 23.

[58] Soc. de Gananciales v. Véles & Asoc., *supra*, pp. 517-518.

[59] En cuanto a las limitaciones para trabajadores manuales, véase Soc. de Gananciales v. Vélez & Asoc., *supra*, p. 519; Camacho Arroyo v. E.L.A., 131 D.P.R. 718, 726 (1992). "El ámbito de aplicación del artículo [1476] es sumamente limitado".

[60] En específico, el artículo 1476 del Código Civil, 31 L.P.R.A. § 4114.

[61] López Fantauzzi v. 100% Natural, *infra*, p. 13.

[62] *Id*, pp. 15-17.

En cuanto a los contratos de servicios profesionales, aclaramos en Nasser Rizek v. Hernández que: "[E]l arrendamiento de servicios de una profesión liberal es aquel donde un profesional pone a disposición de la persona una actividad intelectual o técnica retribuida. Su característica principal es la forma autóctona e independiente en que el profesional, poseedor del título habilitante, la ejerce".[63]

De esa forma, la contratación de empleados por tiempo específico o para cierta obra es totalmente válida en nuestro ordenamiento. No obstante, no es válido usar este tipo de contrato simplemente para no tener que cumplir con la protección que le ha querido dar nuestra legislación al empleado frente a los despidos injustificados o caprichosos.[64] La práctica de renovar un contrato de este tipo automáticamente es, según explica Delgado Zayas, un fuerte indicio de su uso como subterfugio:[65] "El problema surge, tan pronto el contrato se renueva de forma automática sin que haya razones *bona fide* que lo requieran, o se contratan por tiempo específico empleados que van hacer funciones normales y regulares en una empresa y que la necesidad de las mismas es indefinida, o que tienen una

---

[63] Nasser Rizek v. Hernández, 123 D.P.R. 360, 369 (1989). (Énfasis suplido).

[64] Delgado Zayas, *Op.Cit.*, p. 22.

[65] *Íd.*, p. 21. (Énfasis suplido).

duración tan prolongada que en términos prácticos se convierten en indefinidos".[66]

Nuestra jurisprudencia ha visto con cautela el uso de contratos de empleo por tiempo definido, precisamente por su posible uso como subterfugio para esquivar las obligaciones de la legislación laboral.[67] En García Burgos v. A.E.E.L.A., las Opiniones de Conformidad del Juez Asociado Fuster Berlingeri y del Juez Asociado Rivera Pérez dan la voz de alerta contra el uso del mecanismo de la contratación por tiempo definido con este propósito frente a las obligaciones y prohibiciones de la Ley 80. Nos dice el Juez Asociado Fuster Berlingeri:

> Aun en el caso de que el empleado sí haya sido contratado por tiempo determinado, se entenderá que aplica la [Ley Núm. 80], si el contrato no cumple con los requisitos esbozados en la propia ley para considerarlo un contrato *bona fide* por tiempo cierto o para un proyecto de obra cierta. Aplicará también la Ley Núm. 80, si hubiese evidencia en la contratación que apuntase a la creación de una expectativa razonable de continuidad en el empleo por tiempo determinado.[68]

---

[66] *Íd.*

[67] A semejante conclusión ha llegado el Departamento del Trabajo y Recursos Humanos. Guía Revisada para la Interpretación y Aplicación de la Ley Núm. 80, (1996). "Constituyen empleados temporeros aquellos que son contratados por un término específico de tiempo o para cierta obra, tras lo cual no se retiene personal alguno realizando las labores de los mismos. […] Los contratos de empleo temporero sirven el propósito de permitirle al patrono suplir una necesidad provisional de empleo, pero bajo ninguna circunstancia pueden servir como mecanismo para burlar el propósito de la ley". *Íd.*, p. 48. (Énfasis suplido).

[68] García Burgos v. A.E.E.L.A., *supra*, Opinión de Conformidad del Juez Asociado Fuster Berlingeri, n. 1.

Por su parte, el Juez Asociado Rivera Pérez manifiesta que:

> [L]a Ley Núm. 80 establece con claridad que el mero hecho de que un empleado preste servicios al amparo de un contrato por tiempo determinado, por sí solo, no tiene el efecto automático de privarle de su protección y remedio, si la práctica y circunstancias implicadas u otra evidencia en la contratación fuesen de tal naturaleza que tiendan a indicar la creación de una expectativa de continuidad en el empleo o la existencia real de un contrato de empleo por tiempo indeterminado.
>
> La Ley Núm. 80 dispone que en estos casos los empleados así afectados se considerarán <u>como si hubiesen sido contratados sin tiempo indeterminado</u>.
>
> […]
>
> La política pública sobre la contratación de empleados por un término determinado está claramente plasmada en la Ley Núm. 80. El legislador condicionó la existencia y validez de un contrato de empleo por tiempo determinado al cumplimiento de <u>detallados y estrictos requisitos de forma</u>. Su propósito es desalentar la práctica patronal de evadir las disposiciones remediales de la Ley Núm. 80 mediante la contratación de empleados por un tiempo determinado en circunstancias en que éstos, en la práctica, <u>están desempeñando funciones de duración indeterminada</u>.[69]

En <u>Camacho Arroyo v. E.L.A.</u>,[70] recalcamos que la utilidad de los contratos por tiempo fijo radica en "satisfacer una necesidad temporera o accidental".[71] Pocos

---

[69] <u>García Burgos v. A.E.E.L.A.</u>, *supra*, Opinión de Conformidad del Juez Asociado Rivera Pérez, pp. 345-347. (Énfasis suplido).

[70] 131 D.P.R. 718 (1992).

[71] *Íd.*, pp. 731-732.

años después, en <u>Martínez Pérez v. U.C.B.</u>,[72] nos topamos con una controversia muy similar a la de autos. Este caso trataba de una profesora de una universidad privada contratada por un término fijo renovable. Tras analizar sus condiciones de trabajo y el control que la gerencia universitaria ejercía sobre sus funciones, decidimos que "no puede concluirse que la relación entre la demandante y la Universidad sea una de contratista independiente a principal […] irrespectivamente del nombre que se le dé a la terminación del empleo de la [demandante] en la Universidad, llámese incumplimiento de contrato, despido unilateral o despido injustificado".[73] Como veremos, en el contexto educativo, concluir que un docente es un empleado y no un contratista no conlleva automáticamente que éste sea titular de los remedios de la Ley 80 en caso de que no se renueve su contrato, pues puede tratarse de un contrato de empleo por término fijo *bona fide*.

Es evidente, pues, que debemos analizar cautelosamente los contratos denominados "por tiempo cierto". En vez de descansar en los términos utilizados, el mandato legislativo es de analizar <u>la relación de trabajo que realmente se establece entre el patrono y el empleado</u>. En particular, para determinar si un contrato por tiempo cierto es *bona fide*, frente a la presunción en contrario que establece la Ley 80, debemos analizar la naturaleza de

---

[72] 143 D.P.R. 554 (1997).

[73] *Íd.*, p. 566. Véase además <u>Nazario v. Vélez</u>, 97 D.P.R. 458 (1969).

la empresa que lleva a cabo la contratación y si el trabajo llevado a cabo por el empleado es temporero y coyuntural, o si, por el contrario, realiza las funciones que haría un empleado regular. En la empresa privada el reclutamiento de empleados por un término específico de tiempo "está limitado a que el empleo sea uno de carácter provisional, tras lo cual no se retendrá personal alguno realizando las funciones del mismo".[74]

Recientemente, en <u>López Fantauzzi v. 100% Natural</u>,[75] discutimos las protecciones que brinda la Ley 80 en casos de contratos de empleo por tiempo determinado o para obra cierta. Manifestamos en ese caso que la Ley 80 "provee ciertas protecciones adicionales a todo empleado contratado por <u>término cierto</u> a pesar de dicha ley sólo ser de aplicación a empleados contratados por <u>término indefinido</u>".[76] Allí resolvimos que dichas protecciones consisten en:

> (1) La instauración de una <u>presunción rebatible</u> de que todo despido, separación, cesantía, <u>o la no renovación de un contrato de un trabajador empleado por término cierto o para un proyecto u obra cierta</u>, representa una acción sin justa causa, cobijada por la [Ley 80], <u>a no ser</u> que se trate de un contrato por término cierto *bona fide*; y

---

[74] Acevedo Colom, <u>Legislación Protectora del Trabajo</u>, *Op.Cit.*, p. 183. El autor nos ofrece una serie de ejemplos de lo que constituye un contrato por tiempo cierto *bona fide*: trabajadores de una obra de construcción; persona reclutada para cortar caña durante la zafra; época de Navidad con volumen adicional; secretario o secretaria reclutada provisionalmente para atender un inventario que se realiza con fines de liquidar operaciones. *Íd.*

[75] 2011 T.S.P.R. 40.

[76] *Id.*, pp. 17-18 (Énfasis en original).

(2) la definición pormenorizada de lo que constituye un *contrato bona fide* por término cierto o para un proyecto u obra especializada.[77]

Concluimos que "[d]e tal manera, el legislador prohíbe el uso de los contratos por término fijo renovados a voluntad del patrono mensual o anualmente de forma frecuente, como mecanismo para evadir el cumplimiento de la [Ley 80]".[78] Igualmente resolvimos que:

> Es por ello que, para evitar que los patronos diseñen contratos por término fijo u obra cierta que eludan el ámbito de protección provisto por la [Ley 80] <u>será crucial</u> que no tan sólo se catalogue un contrato como uno por término fijo por así disponerlo su título, sino que <u>resulta imperativo examinar</u> si la práctica y circunstancias envueltas u otra evidencia en la contratación han creado en el empleado una expectativa de continuidad en el empleo.[79]

Hemos visto que, además de establecer una presunción de que todo despido es injustificado, en el caso de los contratos de empleo por tiempo cierto la Ley 80 invierte el peso de la prueba, imponiéndole al patrono la obligación de demostrar que el contrato es *bona fide*.[80] Se trata de una

---

[77] *Id.*, p. 18 (Énfasis suplido).

[78] *Id.*, pp. 18-19.

[79] *Id.*, p. 19 (Énfasis suplido). Además de la creación de una expectativa de continuidad en el empleo, el artículo 1 de la Ley 80 también dispone que se tendrá que examinar si la conducta patronal "aparenta ser un contrato de empleo por tiempo indeterminado *bona fide*". <u>29 L.P.R.A. § 185a</u>.

[80] <u>29 L.P.R.A. § 185k(a)</u>. "[C]uando se trate de que el empleado fue contratado por un término cierto o para un proyecto u obra cierta, el patrono vendrá obligado a alegar en la contestación a la demanda estos hechos y <u>a probar la existencia de un contrato bona fide</u> para entonces quedar eximido de cumplir con el remedio que disponen las secs. 185a a 185m de este título, salvo que el patrono pruebe que el despido fue justificado". (Énfasis suplido).

presunción fuerte que requiere que el patrono presente prueba y que ésta sea suficiente para demostrar la naturaleza *bona fide* del contrato por tiempo cierto.[81] El patrono sólo podrá rebatirla si logra establecer que el contrato es *bona fide*.[82] Si no se presenta prueba a esos efectos o si la misma es insuficiente para derrotar la presunción, ésta sobrevive. De ser éste el caso, ahí terminará el análisis del tribunal y el caso se tramitará como una controversia ordinaria de despido injustificado bajo la ley 80. En caso de derrotarse dicha presunción, el tribunal analizará si se generó una expectativa de continuidad en el empleo. De ser éste el caso, deberá concluir que el empleado ha sido contratado por tiempo indeterminado y aplicará igualmente la Ley 80. Para demostrar la naturaleza *bona fide* del contrato, el patrono no puede limitarse a presentar, como su única evidencia, el propio contrato de servicios profesionales cuestionado, precisamente porque lo que está en controversia es si éste

---

[81] Rivera Figueroa v. Fuller Brush, *supra*, p. 18. Véase además Regla 302 de Evidencia de 2009, 32 L.P.R.A. Ap.VI R. 302.

[82] En su artículo 11, la Ley 80, además de establecer los requisitos de forma del contrato por tiempo fijo o para obra cierta, ofrece unos ejemplos del tipo de trabajo que podría contratarse por medio de un contrato de esta naturaleza: "sustituir durante su ausencia a un empleado en el uso de licencia legalmente establecida o establecida por el patrono o para llevar a cabo tareas extraordinarias o de duración corta como son, sin que constituya una limitación, los inventarios anuales, la reparación de equipo, maquinaria o las facilidades de la empresa, el embarque y desembarque casual de carga, el trabajo en determinadas épocas del año como la Navidad, las órdenes temporeras de aumentos de producción y cualquier otro proyecto o actividad particular de corta duración o duración cierta fija". 29 L.P.R.A. § 185k.

es *bona fide*. Más bien, el patrono debe presentar prueba para demostrar por qué una labor en particular debe ser realizada mediante un contrato por tiempo cierto o para obra cierta.

Sin embargo, en el caso de autos, el expediente no contiene prueba alguna, más allá del propio contrato, que tienda a demostrar la naturaleza *bona fide* del contrato de empleo. En López Fantauzzi v. 100% Natural resolvimos en cuanto a esto que el patrono tiene que "establecer que el contrato por término fijo u obra cierta pactado con el obrero es uno *bona fide*".[83] Es decir, que el patrono tiene que probar que hay justa causa para el despido o que el contrato por tiempo determinado u obra cierta es bona fide para eximirse de pagar la mesada provista por la Ley 80.[84]

La legislación laboral vigente en Puerto Rico permite que un patrono contrate a una persona como empleado regular pero sujeto al cumplimiento de un periodo probatorio que le permita al patrono evaluar el trabajo de dicha persona. De esta manera, si durante el periodo probatorio la persona contratada no se desempeña de manera satisfactoria, al finalizar el mismo el patrono puede prescindir de sus servicios sin tener que indemnizarle. Incluso, durante el transcurso del periodo probatorio el patrono puede dar por terminada la relación de trabajo si el empleado incumple con sus labores. Ahora bien, el periodo probatorio está regulado por la Ley 80 para evitar que se utilice de manera

---

[83] López Fantauzzi v. 100% Natural, *supra*, p. 20.

[84] *Id.*, p. 39.

abusiva y se tenga a una persona indefinidamente en un estado probatorio. Sobre lo anterior, la Ley 80 establece:

> Para que todo contrato probatorio de trabajo tenga validez a los fines de excusar al patrono de darle cumplimiento a lo dispuesto en las secs. 185a a 185m de este título, el mismo deberá hacerse por escrito, haciéndose constar la fecha en que comienza y termina el período probatorio, el cual en ningún caso podrá exceder de (3) meses, a no ser que medie un permiso escrito del Secretario del Trabajo y Recursos Humanos. Este podrá autorizar la extensión del período probatorio hasta un máximo de seis (6) meses, cuando a su juicio la naturaleza del trabajo así lo requiera. El contrato básico de período de probatorio deberá hacerse antes de que el empleado comience a prestar servicios para el patrono. Todo contrato de período probatorio convenido con posterioridad al comienzo de la prestación de servicios será ilegal y nulo.
>
> […]
>
> Si vencido el término establecido en el contrato probatorio, o la extensión válida del mismo, el empleado continúa realizando trabajo para el patrono, dicho empleado adquirirá todos los derechos de un empleado tal y como si hubiese sido contratado sin tiempo determinado.[85]

Como puede observarse, el mandato de la Ley 80 es meridianamente claro: nadie puede estar trabajando por más de 90 días de manera probatoria. Si al finalizar dicho periodo el trabajador continúa laborando en su puesto, éste se convertirá en empleado regular del establecimiento. Estos contratos probatorios deben analizarse con la misma cautela que hemos utilizado para determinar si un contrato por tiempo cierto es *bona fide* o un intento de evadir la

---

[85] 29 L.P.R.A. § 185h. (Énfasis suplido). Véase además Guía Revisada para la Interpretación y Aplicación de la Ley Núm. 80, *Op.Cit.*, p. 44, que establece que, aunque el tiempo que el empleado esté trabajando posterior al vencimiento del plazo probatorio sea "mínimo", aplica el mandato de la Ley 80 que le convierte en empleado regular.

legislación laboral. Por eso, hemos advertido que en cuanto
a los contratos probatorios "[l]a mera denominación en ese
sentido no es decisiva; todo dependerá del conjunto de las
circunstancias".[86]

IV.

A.

La sección 16 del Artículo II de nuestra Constitución
reconoce, entre otros, el derecho de todo trabajador a
"protección contra riesgos para su salud o integridad
personal en su trabajo o empleo". Como parte del cauce
estatutario de ese mandato constitucional, la Asamblea
Legislativa ha aprobado varias leyes especiales dirigidas
específicamente a proteger a los trabajadores que por
accidente o enfermedad, ya sea ocupacional o no-
ocupacional, se inhabilitan temporeramente para trabajar.[87]
Esto, con el propósito de ampliar el alcance y protección
de la citada disposición constitucional "a relaciones
obrero-patronales entre personas privadas, disponiendo
remedios particulares en beneficio de los trabajadores".[88]

La Ley 138 de 26 de junio de 1968, según enmendada,
mejor conocida como la Ley de Protección Social por

---

[86] Cassasús Rodríguez v. Escambrón Beach Hotel, 86 D.P.R.
375, n. 6 (1962).

[87] García v. Darex P.R., Inc., 148 D.P.R. 364, 374 (1999);
Cuevas v. Ethicon Div. J & J Prof. Co., 148 D.P.R. 839, 845
(1999); Torres v. Star Kist Caribe, Inc., 134 D.P.R. 1026,
1029 (1994); Delgado Zayas, Legislación Protectora del
Trabajo Comentada, Op.Cit., p. 187.

[88] Díaz v. Pneumatics & Hydraulics, 169 D.P.R. 273, 285
(2006).

Accidentes de Automóviles,[89] atiende diversos asuntos relacionados con accidentes de tránsito, particularmente en cuanto al tratamiento a las víctimas de estos accidentes. Esta Ley fue promulgada con el propósito de establecer un sistema de seguro y compensación por accidentes de tránsito, el cual "[redujera] a un mínimo los trágicos efectos económicos y sociales producidos por [éstos] sobre la familia y demás dependientes de sus víctimas".[90] La Asamblea Legislativa procuró suplir a las víctimas de un accidente automotriz —y a sus dependientes- un alivio que las librara del desamparo y desvalimiento económico que arriba como consecuencia de una tragedia de tal naturaleza, mediante la concesión de servicios médico-hospitalarios, ingresos y un surtido de beneficios adicionales.

Como podrá notarse, no se trata de una legislación de naturaleza laboral. No obstante, como ley reparadora, atiende un sinnúmero de escenarios que son consecuencia de un accidente automovilístico, entre ellos, el de un trabajador que quede inhabilitado temporeramente para desempeñar sus labores como consecuencia de un accidente de tránsito.

En la consecución de dicho fin loable, la Ley ACAA estableció una reserva de empleo para todo trabajador que quede inhabilitado temporeramente por esta razón:

> En los casos de incapacidad cubiertos por este capítulo, cuando el lesionado estuviese empleado, el patrono vendrá obligado a reservar

---

[89] 9 L.P.R.A. §§ 2501 *et seq.*

[90] Exposición de Motivos, Ley 45 de 26 de junio de 1987, Leyes de Puerto Rico, p. 158.

el empleo que desempeña el trabajador al momento de comenzar la incapacidad y a reinstalarlo en el mismo, sujeto a las siguientes condiciones:

> i. Que el trabajador requiera al patrono que lo reponga en su empleo dentro del término de quince (15) días, contados a partir de la fecha en que fuere dado de alta, y siempre y cuando que dicho requerimiento no se haga después de transcurridos seis (6) meses desde la fecha de comienzo de la incapacidad;
>
> ii. que el trabajador esté mental y físicamente capacitado para ocupar dicho empleo en el momento en que solicite del patrono dicha reposición, y
>
> iii. que dicho empleo subsista al momento en que el trabajador solicite su reposición. Se entenderá que el empleo subsiste cuando el mismo esté vacante o lo ocupe otro trabajador. Se presumirá que el empleo estaba vacante cuando el mismo fuere cubierto por otro trabajador dentro de los treinta (30) días subsiguientes a la fecha en que se hizo el requerimiento de reposición.

Si el patrono no cumpliera con las disposiciones de esta cláusula vendrá obligado a pagar al trabajador o a sus beneficiarios los salarios que dicho trabajador hubiese devengado de haber sido reinstalado. Además, le responderá de todos los daños y perjuicios que le haya ocasionado…[91]

En cuanto a quién es un "empleado" para efectos de esta reserva y qué tipo de incapacidad se requiere para que ésta se active, la propia Ley ACAA ofrece las correspondientes definiciones. Al definir el término "empleo", la Ley establece lo siguiente:

---

[91] 9 L.P.R.A. § 2054(3)(b). (Énfasis suplido).

El servicio que preste una persona será considerado como empleo […] _independientemente de si existe o no una relación obrero-patronal_, a menos y hasta que se demuestre la existencia de las siguientes condiciones:

> (a) Que el patrono no ejerce, ni puede ejercer mando o supervisión sobre la persona;
>
> (b) que la persona presta el servicio fuera del curso normal o de los sitios de negocio del patrono;
>
> (c) que la persona presta ese servicio como parte de la actividad normal de su trabajo, negocio o profesión, cuyo servicio está disponible a otras personas y no cesa al terminar su relación contractual con el patrono.[92]

Además, la Ley ACAA define "incapacidad" como:

> [A]quella de tal naturaleza que impida a la víctima en forma total y continua dedicarse a cualquier empleo u ocupación para el cual está capacitada por educación, experiencia o entrenamiento.[93]

Hasta ahora, no habíamos tenido la oportunidad de interpretar esta reserva de empleo establecida por la Ley ACAA. De entrada, sin embargo, sabemos que como ley reparadora, nos corresponde interpretarla liberalmente con miras a cumplir la intención legislativa de protección.[94] Por tanto, analizaremos primeramente la interpretación que hemos hecho de otros estatutos que establecen reservas de empleo similares a la de esta ley.[95] En particular,

---

[92] 9 L.P.R.A. § 2052(14). (Énfasis suplido).

[93] 9 L.P.R.A. § 2051(9).

[94] García v. Darex P.R., Inc., 148 D.P.R. 364, 379 (1999).

[95] "Las leyes que se refieren a la misma materia o cuyo objeto sea el mismo, deben ser interpretadas refiriendo las unas a las otras, por cuanto lo que es claro en uno de sus preceptos pueda ser tomado para explicar lo que resulte

analizaremos la Ley del Sistema de Compensaciones para Accidentes de Trabajo (Ley de Accidentes del Trabajo),[96] la Ley de Beneficios por Incapacidad Temporal (SINOT)[97] y la Ley de Seguro Social para Choferes y Otros Empleados.[98] Hemos utilizado este tipo de análisis integral consistentemente en el pasado, al interpretar las diversas reservas de empleo establecidas en distintas leyes especiales, con miras a plasmar una interpretación uniforme.[99] Incluso, la propia Asamblea Legislativa ha

---

dudoso en otro". Artículo 18 del Código Civil, 31 L.P.R.A. § 18.

[96] Ley 45 de 18 de abril de 1935, según enmendada, 11 L.P.R.A. §§ et seq.

[97] Ley 139 de 26 de junio de 1968, según enmendada, 11 L.P.R.A. §§ 201 et seq.

[98] Ley 428 de 15 de mayo de 1950, según enmendada, 29 L.P.R.A. §§ 681 et seq.

[99] Véase Delgado Zayas, Legislación Protectora del Trabajo Comentada, Op.Cit., p. 193, mencionando a la Ley ACAA en conjunto con las reservas establecidas por la Ley del Sistema de Compensaciones por Accidentes de Trabajo, la Ley de Beneficios por Incapacidad Temporal (SINOT) y la Ley de Seguro Social para Choferes y otros empleados; Taste Freeze v. Negdo. Seg. Empleo, 111 D.P.R. 809 (1981), comparando como las definiciones provistas por la Ley de Seguridad de Empleo están reproducidas en la Ley de Beneficios por Incapacidad (SINOT); Cuevas v. Ethicon Div. J & J Prof. Co., supra, pp. 851-852, comparando la Ley 148 con SINOT en cuanto a la fecha de inicio de la reserva de empleo; Díaz v. Pneumatics & Hydraulics, 169 D.P.R. 273, 285 (2006) utilizando como ejemplos la Ley del Sistema de Compensaciones por Accidentes de Trabajo con SINOT y la Ley de Seguro Social para Choferes y otros empleados. En particular, en este caso hicimos énfasis en la redacción similar de ambos estatutos en cuanto a la reserva de empleo. Íd., p. 287. Semejante análisis es ofrecido entre SINOT y la Ley de Accidentes del Trabajo en José Luis Verdiales Morales & José J. Santiago Meléndez, Reserva de Empleo al Obrero Incapacitado por Accidente Laboral: Requisitos bajo el Artículo 5A de la Ley de Compensaciones por Accidentes del Trabajo, 61 Rev. Jur. U.P.R. 59, 67 (1992).

utilizado un análisis comparativo para precisar las protecciones ofrecidas por las diferentes leyes especiales que establecen reservas de empleos.[100]

B.

El artículo 5-A de la Ley de Accidentes del Trabajo atiende específicamente la reserva de empleo cuando el trabajador sufre una incapacidad como resultado de un accidente en el trabajo.[101] Una lectura de dicho artículo y la disposición correspondiente de la Ley ACAA revela una redacción casi idéntica, en particular, en cuanto a las obligaciones patronales, los requisitos que tiene que cumplir el empleado y el remedio otorgado.[102] La principal diferencia sustantiva entre ambas reservas es el término de duración, pues bajo la Ley de Accidentes del Trabajo la reserva tiene una extensión de doce meses mientras que en la Ley ACAA es de seis meses. Dado que la duración de la reserva no es parte de la controversia en el caso de autos, pasamos a analizar cómo hemos interpretado la reserva

---

[100] *Véase* Ley 16 de 15 de abril de 1988, que enmendó la Ley 428, en cuya Exposición de Motivos se hace referencia a SINOT, la Ley de Accidentes del Trabajo y la Ley ACAA. Dicha referencia tuvo como propósito equiparar la Ley 428 a las demás leyes especiales "concediéndole el mismo derecho y beneficio de reinstalación en su empleo [al trabajador] en casos de inhabilitación para el trabajo". Leyes de Puerto Rico, 1988, p. 78.

[101] 11 L.P.R.A. § 7.

[102] *Id.* En cuanto a los remedios disponibles al amparo de la Ley de Accidentes del Trabajo, hemos hecho hincapié en que este estatuto provee para la reinstalación, la indemnización de los daños y perjuicios ocasionados, así como los salarios dejados de percibir. Rivera v. Blanco Vélez Stores, 155. D.P.R. 460 (2001).

establecida por la Ley de Accidentes del Trabajo, pues ésta "constituye el eje central de todo el esquema jurídico establecido por el Estado para la protección del obrero en su taller de trabajo".[103]

Hemos determinado que este tipo de estatuto ofrece protecciones y remedios superiores a los de la Ley 80, pues, como ley especial, constituye una excepción por consideraciones de política pública al remedio exclusivo provisto por la Ley 80 en casos de despidos injustificados.[104] El artículo 5-A de la Ley de Accidentes del Trabajo establece dos tipos de protección para el obrero que sufre un accidente de trabajo. Primero, le impone al patrono el deber de reservarle por doce meses el empleo en que se desempeñaba el obrero al momento de ocurrir el accidente. En segundo lugar, el trabajador tiene derecho a que lo repongan en ese mismo empleo una vez el Fondo lo da de alta, si lo solicita al patrono dentro del mismo término de doce meses y si cumple con las tres condiciones establecidas en la Ley.[105] Dicho término de doce meses es de caducidad y comienza a discurrir desde que el obrero sufrió el accidente o enfermedad.[106]

---

[103] Laracuente v. Pfizer, 160 D.P.R. 195, Opinión de Conformidad del Juez Asociado Fuster Berlingeri, p. 216, citando a Cuevas v. Ethicon Div. J & J Prof. Co., *supra*, p. 845.

[104] *Véase* Rivera Rivera v. Ins. Wire Prods., Corp., 158 D.P.R. 110, 117 (2002); Soc. de Gananciales v. Royal Bank de P.R., 145 D.P.R. 178, 192 (1998); Vélez Rodríguez v. Pueblo Int'l, Inc., 135 D.P.R. 500, 512-513, 515 (1994).

[105] García v. Darex P.R., Inc., *supra*, p. 376.

[106] Cuevas v. Ethicon Div. J & J Prof. Co., *supra*, p. 851.

Esta reserva tiene como propósito eliminar como justa causa para el despido la inhabilitación del empleado para continuar llevando a cabo su trabajo mientras recibe tratamiento y estimularlo a que acuda al Fondo del Seguro del Estado sin temor a ser despedido.[107] Hemos resuelto que la obligación de reservar el puesto por doce meses desde la enfermedad o lesión es independiente de la que le requiere al patrono reinstalar al obrero lesionado que satisfaga los requisitos del artículo 5-A. El patrono que despida al obrero lesionado incumpliendo con el deber de reserva, responderá por los daños y perjuicios que su incumplimiento produzca, salvo que el despido haya sido por justa causa.[108]

De esa forma, el artículo 5-A impone dos obligaciones simultáneas al patrono. Primeramente, reservar el puesto por doce meses mientras dure la inhabilidad. En segundo lugar, reponer al empleado si éste pide reinstalación tras ser dado de alta sí no han transcurrido más de doce meses desde el accidente. En esas circunstancias, no puede despedirlo.[109] Incluso, si "un empleado que estuvo reportado al [Fondo] solicita ser reinstalado en su empleo y cumple

---

[107] García v. Darex P.R., Inc., *supra*, p. 377. En cuanto al tipo de inhabilidad para trabajar requerido para que se active esta reserva, véase Rodríguez v. Méndez & Co., 147 D.P.R. 734 (1999) y Torres v. Policía, 159 D.P.R. 339, 356 (2003).

[108] García v. Darex P.R., Inc., *supra*, pp. 379-381.

[109] Vélez Rodríguez v. Pueblo Int'l, Inc., *supra*, p. 514. "Le corresponde al patrono levantar como defensa que no existe una de [las] condiciones para quedar liberado de su obligación. Si el patrono incumple con su obligación, vendrá obligado a reinstalar al empleado". Véase además Torres v. Policía, *supra*, p. 354.

con los requisitos establecidos por la ley, y su patrono no lo reinstala, esto constituye un despido".[110] Por eso, un empleado que es despedido sin justa causa durante el periodo de reserva no tiene que pedir la reinstalación al ser dado de alta, pues ya el patrono ha incumplido con su obligación de reservar el puesto y el empleado tiene una causa de acción al amparo de la Ley de Accidentes del Trabajo.[111] Esto, pues la reserva es "independiente de si el obrero solicita o no su reinstalación dentro del periodo establecido. Si el patrono no cumple con dicha reserva responde por todos los daños y perjuicios que su incumplimiento produzca".[112] Para quedar protegido por la reserva del artículo 5-A, el empleado debe haberse reportado al Fondo antes de ser despedido.[113] No obstante, la ley "no sujeta la obligación del patrono –de reservarle

---

[110] Vélez Rodríguez v. Pueblo Int'l, Inc., supra, p. 515. (Énfasis suplido).

[111] Rivera Rivera v. Ins. Wire Prods., Corp., supra, pp. 125-126. "Hoy decretamos que el requisito de solicitar la reinstalación establecido [en la Ley de Accidentes del Trabajo], y lo resuelto en García v. Darex P.R., Inc., supra, no aplica a casos como éste en los cuales, en violación al período de reserva, el patrono despide injustificadamente al obrero mientras éste está reportado al Fondo, que eventualmente lo da de alta también dentro del período de reserva. […] [E]l deber del obrero lesionado de solicitarle al patrono su reinstalación parte de la premisa de que aún existe una relación obrero-patronal [y] en ausencia de una relación obrero-patronal, provocada por el despido injustificado del recurrido durante el período de reserva, el recurrido no venía obligado a solicitarle a la peticionaria su reinstalación".

[112] Santos v. Lederle, 153 D.P.R. 812, 823 (2001).

[113] Íd., p. 824; Santiago v. Kodak Caribbean, Ltd., 129 D.P.R. 763 (1992).

el puesto de un obrero- <u>a la eventualidad de si el primero informa o no el accidente</u>".[114]

Cabe señalar que, durante ese periodo de reserva para que el obrero se recupere, el patrono puede contratar a otro obrero para "cubrir temporeramente el puesto del lesionado mediante un contrato de empleo *bona fide* de término cierto que satisfaga lo requerido por el artículo 8 de la Ley Núm. 80 de 30 de mayo de 1976".[115]

La Asamblea Legislativa se ha ocupado de modificar las demás leyes especiales que establecen reservas de empleo para asemejarlas entre sí y este Tribunal las ha interpretado de manera similar. Ejemplo de esto es la reserva establecida por la Ley de Beneficios por Incapacidad Temporal (SINOT).[116] Este estatuto constituye la versión no-ocupacional de la Ley de Accidentes del Trabajo. Actualmente, tras un proceso de enmiendas encaminadas a equiparar las reservas establecidas en estas leyes, ambas reservas son prácticamente idénticas. Lo mismo es cierto de la jurisprudencia que las interpreta. Como habíamos adelantado, esta identidad entre la Ley de Accidentes del Trabajo y SINOT también es compartida con la reserva de la Ley ACAA. Al igual que hemos hecho con la reserva provista por la Ley de Accidentes del Trabajo, en cuanto a la reserva de SINOT hemos resuelto que si el empleado es

---

[114] <u>Santos v. Lederle</u>, *supra*, p. 825. (Énfasis suplido).

[115] <u>García v. Darex P.R., Inc.</u>, *supra*, p. 377 (Énfasis suplido).

[116] <u>11 L.P.R.A. § 203(q)</u>.

despedido durante la vigencia del periodo de reserva, no tiene que solicitar al patrono su reinstalación posteriormente.[117] Esto, pues la "legislación obliga al patrono a reservar el empleo que desempeñe el trabajador al momento de comenzar la incapacidad",[118] igual que en la Ley de Accidentes del Trabajo, y tal y como provee la Ley ACAA. Incluso, hemos interpretado que la solicitud de reinstalación al amparo de SINOT puede hacerse verbalmente.[119]

Finalmente, cabe destacar que la reserva de empleo provista por la Ley de Seguro Social para Choferes y otros Empleados es casi idéntica a las establecidas por las demás leyes ya mencionadas.[120] Esta reserva fue objeto de análisis en Díaz v. Pneumatics & Hydraulics. Declaramos entonces, en cuanto a la interacción entre la reserva creada por la ley y el derecho de reinstalación que tiene el empleado, que "[l]a sabiduría relacional de dichas obligaciones está en que una reserva de empleo sin derecho a reinstalación carecería de sentido y eficacia protectora para el empleo".[121] Igualmente, hemos manifestado que "siendo de

---

[117] Meléndez v. Asoc. Hosp. del Maestro, 156 D.P.R. 828, n. 13 (2002). En cuanto al asunto de la inhabilidad para el empleo, hemos definido la misma igualmente bajo SINOT que bajo la Ley de Accidentes del Trabajo. Torres González v. Depto. del Trabajo, 127 D.P.R. 931, 936 (1991).

[118] Íd., p. 857.

[119] Rojas v. Méndez & Co., Inc., 115 D.P.R. 50 (1984).

[120] 29 L.P.R.A. §693a.

[121] Díaz v. Pneumatics & Hydraulics, supra, p. 287. Al interpretar esta reserva, nos basamos en interpretaciones anteriores sobre el artículo 5-A de la Ley de Accidentes del Trabajo. En cuanto a la reserva, dijimos que la misma

raigambre constitucional, el propósito que persigue el citado Art. 16 de la Ley de Seguro Social para Choferes, *supra*, es de altísimo interés público".[122]

### C.

No hay razón para interpretar la reserva provista por la Ley ACAA de manera distinta a las demás reservas previamente mencionadas. Todas ellas persiguen el mismo objetivo reparador y no es casualidad que estén escritas de manera casi idénticas. Éste es resultado de un bien pensado régimen legislativo cuyo propósito es proteger el empleo de aquellos trabajadores y trabajadoras que, producto de un accidente, ya sea ocupacional, no-ocupacional o como resultado de un accidente automovilístico, quedan temporeramente inhabilitados para trabajar.

Por tanto, interpretaremos la reserva provista por la Ley ACAA de manera consistente con las demás. Es decir, concluimos que esta reserva impone dos obligaciones al patrono. En primer lugar, la obligación de reservar el empleo por un período de seis meses a un trabajador que, producto de un accidente de tránsito, se reporta a la ACAA

---

se activa cuando se produce un accidente o enfermedad que inhabilita al obrero y éste se acoge a la licencia especial luego de que su ausencia sea recomendada por un médico. En cuanto a la reinstalación, manifestamos que la misma se activa si el trabajador formula un requerimiento dentro de los 30 días luego de una autorización médica para regresar a trabajar, si presenta el requerimiento dentro del año del comienzo de la incapacidad, está mental y físicamente capacitado para ocupar el empleo y subsiste la plaza o puesto de empleo. *Íd.*, pp. 287-288.

[122] *Íd.*, p. 288. En cuanto a los remedios que ofrece la ley, estos son idénticos a los de la Ley de Accidentes del Trabajo, SINOT y la Ley ACAA.

para recibir tratamiento médico. Esta reserva comenzará desde el momento en que se produce el accidente que incapacita al trabajador para realizar sus funciones. De igual forma, si el empleado se recupera de su incapacidad dentro del periodo de seis meses contemplados en la ley, el estatuto le impone al patrono la obligación de reinstalarlo en su puesto, siempre y cuando el empleado lo solicite y se den las condiciones provistas en la propia ley.[123] En caso de que el patrono incumpla con cualquiera de estas dos obligaciones, tendrá que reponer al empleado en su puesto, compensarle por los daños y perjuicios causados y pagarle los salarios dejados de percibir.[124] Si el patrono despide al trabajador antes de que se venza el periodo de seis meses, pero después de que el empleado se haya reportado a la ACAA para recibir tratamiento, estará en violación de la Ley ACAA y procederá la concesión de los remedios previamente mencionados.

De igual forma, bastará una notificación verbal al patrono de que se sufrió el accidente y que se está recibiendo tratamiento en la ACAA para escudar al empleado

---

[123] Éstas son: que el trabajador haga el requerimiento dentro de los 15 días a partir del alta, siempre y cuando no hayan transcurrido seis (6) meses desde la fecha del comienzo de la incapacidad; que esté mental y físicamente capacitado para dicho empleo en el momento en que haga la solicitud; y que el empleo aún subsista al momento del requerimiento. Se entenderá que el empleo subsiste cuando el mismo esté vacante o lo ocupe otro trabajador. Se presumirá que el empleo estaba vacante cuando el mismo fuere cubierto por otro trabajador dentro de los treinta (30) días en que se hizo el requerimiento de reposición. 9 L.P.R.A. § 2054(3)(b).

[124] *Íd.*

de un despido. El patrono podrá despedir al empleado durante el periodo de reserva <u>únicamente</u> si hay causa justa para ello. Como regla general, no hará falta que el empleado informe al patrono que recibe los beneficios de la ACAA para que se active la reserva de empleo.[125] Lo ideal sería que el empleado notifique de ello al patrono tan pronto pueda. Si el patrono despide al empleado antes de advenir en conocimiento de que, en efecto, se había activado la reserva, éste tendrá que dejar sin efecto el despido una vez se entere de la existencia de la misma. Si en ese momento deja sin efecto el despido, no responderá por daños y perjuicios, y únicamente tendrá que reponer al empleado a su antiguo puesto. Por el contrario, si una vez enterado de la reserva el patrono insiste en el despido y no logra demostrar justa causa, tendrá que reponer al

---

[125] El Reglamento para la Ley de Protección Social por Accidentes de Automóviles, que pone en vigor la Ley ACAA, establece a quién un beneficiario de dicho estatuto tiene el deber de notificar el accidente:

> Toda persona que tuviere un accidente relacionado con el uso o mantenimiento de un vehículo de motor como tal vehículo, con motivos del cual resultara lesionada, enferma o muerta alguna persona, tendrá que informarlo a la <u>Policía de Puerto Rico y a la Administración</u> [ACAA] según los términos estipulados por Ley.

(Énfasis suplido). Regla 6, Reglamento Núm. 6911 del 1 de diciembre de 2004. En consecuencia, el Reglamento que implementa la Ley ACAA es consistente con dicho estatuto al no imponerle al trabajador un requisito de notificación de accidente al patrono. La Asamblea Legislativa optó por limitar la notificación al patrono en lo que atañe al requerimiento de reinstalación en el empleo del término de quince (15) días dispuesto en dicha ley. No procede imponerle al empelado un requisito adicional para ejercer su derecho de reserva de empleo, el cual no está contemplado ni en la Ley ACAA ni en el Reglamento que la canaliza.

empleado, pagar salarios dejados de percibir y responderá por los daños y perjuicios que cause. Ahora bien, esta regla general debe aplicarse caso a caso para evitar una implementación mecánica que produzca un resultado absurdo o injusto. Entre los factores a considerar estarán la buena fe patronal, la diligencia del obrero en tomar medidas para poner al patrono en una posición que pueda hacer más efectiva la reserva y las consecuencias colaterales que puedan generarse. Claro está, la inhabilidad del trabajador durante ese periodo para llevar a cabo los deberes de su puesto no será justa causa para el despido. Pasado los seis meses, si el empleado aún está incapacitado para trabajar o si no se cumple con las exigencias de ley para solicitar la reinstalación, el patrono podrá despedir al empleado.

V.

A diferencia de la definición de empleado provista por la Ley 80, que distingue entre el contratista y el empleado y, a su vez, entre el empleado contratado por tiempo cierto de manera *bona fide* y el empleado por tiempo indeterminado, la Ley ACAA dispone específicamente que aplica, "independientemente de si existe o no una relación obrero-patronal". A esos efectos, se considerará que es empleo cualquier servicio que preste una persona, salvo que se demuestre una de las siguientes condiciones:

> (a) Que el patrono no ejerce, ni puede ejercer mando o supervisión sobre la persona;
> (b) que la persona presta el servicio fuera del curso normal o de los sitios de negocio del patrono;

(c) que la persona presta ese servicio como parte de la actividad normal de su trabajo, negocio o profesión, cuyo servicio está disponible a otras personas y no cesa al terminar su relación contractual con el patrono.[126]

Se trata de una definición más amplia que la de la Ley 80, en tanto <u>expresamente cubre a muchos trabajadores que prestan servicios fuera de la relación tradicional de empleado-patrono en la que el trabajador es contratado por tiempo indefinido</u>. El texto abarcador de la ley cobija a ciertos contratistas y empleados bajo contrato por tiempo cierto *bona fide*. Es una ampliación de la protección que ofrece la reserva de empleo <u>que no es única a la Ley ACAA</u>, pues, tanto SINOT como la Ley de Seguridad de Empleo tienen una definición prácticamente <u>idéntica</u> del término empleo para efectos de su protección.[127]

Nuestra jurisprudencia ha reconocido esta realidad y consistentemente hemos puesto en vigor el mandato de ley de ampliar la gama de trabajadores cobijados por estas leyes especiales. En <u>Avon Products, Inc. v. Srio. del Trabajo</u>, resolvimos que, al amparo de la Ley de Seguridad de Empleo,[128] unas vendedoras de productos de belleza casa por casa eran empleadas y no contratistas para efectos de las protecciones establecidas en dicho estatuto. En <u>Taste</u>

---

[126] <u>9 L.P.R.A. § 2052(14)</u>. (Énfasis suplido).

[127] *Véanse* <u>11 L.P.R.A. § 202(j)(5)</u> y <u>29 L.P.R.A. § 702(k)(5)</u>.

[128] Ley número 74 de 21 de junio de 1956, según enmendada, <u>29 L.P.R.A. §§ 701 *et seq.*</u>

<u>Freeze v. Negdo. Seg. Empleo</u>, llegamos a una decisión simular. Habiendo concluido que la Ley de Seguridad de Empleo, por su amplia definición de lo que constituye empleo, cobija a trabajadores que no son empleados regulares por tiempo indefinido, no podemos menos que concluir lo mismo respecto a la Ley ACAA <u>ya que las definiciones estatutarias de lo que constituye empleo en ambas leyes son idénticas.</u>[129] Resulta igualmente forzoso concluir que la reserva de la Ley ACAA protege tanto a empleados contratados por tiempo indefinido como a empleados bajo contrato por término cierto *bona fide*, exceptuando únicamente aquellos trabajadores expresamente mencionados en la propia Ley.

En conclusión, para que se active la reserva de empleo bajo la Ley ACAA, resulta imprescindible que: (1) la víctima labore a cambio de remuneración para algún patrono, (2) que la incapacidad producto de un accidente vehicular la inhabilite para trabajar, y (3) que se acoja a los beneficios provistos por la Ley ACAA. Para que proceda la reinstalación tendrán que darse las siguientes condiciones: (1) que dentro de los 15 días siguientes a habérsele dado

---

[129] Si bien hemos usado la Ley de Accidentes del Trabajo como principal punto de referencia comparativa, en esta materia no podemos hacer lo mismo porque la Ley de Accidentes del Trabajo tiene una definición estatutaria de empleo muy distinta a la Ley ACAA y SINOT. Cabe señalar que las exclusiones que surgen de la Ley de Accidentes del Trabajo en cuanto a qué constituye empleo para efectos de su protección, son expresas y limitadas. No hay tal exclusión en la Ley ACAA. Esta divergencia es lógica, ya que la Ley de Accidentes del Trabajo tiene como eje central las relaciones obrero-patronales, mientras que la Ley ACAA atiende accidentes de tránsito y protege a todas las personas afectadas por éstos independientemente de la relación que tengan con sus respectivos patronos.

de alta definitivamente y autorizado a trabajar por la ACAA, la víctima solicite a su patrono su reinstalación en su antiguo puesto, (2) que dicho requerimiento de reposición se haga dentro de los 6 meses de haber sufrido la incapacidad, (3) que al solicitar su reposición la víctima esté física y mentalmente capacitada para desempeñarse en las funciones del empleo que ocupaba, y (4) que dicho empleo subsista al momento que la víctima solicite su reinstalación.

## VI.

Entre los remedios que otorga la reserva provista en la Ley ACAA está el pago de los salarios que dejó de percibir el empleado ilegalmente despedido. El propósito de otorgar los salarios dejados de percibir a un empleado despedido en violación de una reserva de trabajo, conjuntamente con la reinstalación, es devolver al trabajador al estado en que se encontraba antes de la actuación ilegal de su patrono, como si nunca hubiese sido despedido y como si nunca hubiese dejado de devengar su salario. Por eso, el dinero que un trabajador ilegalmente despedido devengue de un trabajo realizado después del despido pero antes de que recaiga sentencia a su favor en el pleito por violación de la reserva, debe restarse del monto del salario que dejó de percibir en el puesto original. Esto es cónsono con el objetivo reparador de la Ley ACAA. En Rivera v. Ins. Wire

Prods., Corp., al interpretar la Ley de Accidentes del Trabajo, llegamos a esa conclusión:

> [E]n virtud del carácter reparador de la Ley Núm. 45, *supra*, el [empleado] tendrá derecho a que [el patrono] le reembolse la cuantía correspondiente como si él hubiese continuado trabajando durante el período entre el despido y el dictamen del [foro de instancia]. Ello implica que procede descontar los salarios que el recurrido devengó de los empleos posteriores al despido. Lo importante es que el recurrido no se perjudique económicamente como consecuencia del despido injustificado, es decir, que el recurrido no devengue un salario menor al que hubiese recibido de haber continuado trabajando para [el patrono]. De lo contrario, le estaríamos imputando a la Ley Núm. 45, *supra*, un carácter punitivo que no tiene.[130]

Por eso, la prueba de los salarios que devengó el empleado entre su despido y la sentencia es fundamental para otorgar un remedio adecuado en derecho y, contrario a la conclusión del foro de primera instancia en este caso, su presentación no está condicionada a que se haga al contestar la demanda o en otras etapas iniciales. Por el contrario, se podrá presentar cuando el tribunal confeccione el remedio correspondiente.

La Ley ACAA también provee para la indemnización de daños y perjuicios adicionales a los salarios dejados de percibir. La cuantía de dichos daños es una determinación de hecho que descansa en la sana discreción del tribunal según la prueba que le sea presentada.

VII.

---

[130] Rivera v. Ins. Wire Prods., Corp., *supra*, p. 129. Véase además Hernández v. Mun. de Aguadill, 154 D.P.R. 199 (2001).

Pasamos ahora a resolver la controversia ante nuestra consideración a la luz del derecho anteriormente expuesto.

De la faz del "Contrato de Servicios Profesionales" que suscribió el señor Whittenburg y de un análisis de sus condiciones de trabajo, no hay duda de que éste era un empleado del Colegio Nuestra Señora del Carmen y no un "contratista". El señor Whittenburg tenía un horario fijo de trabajo de 7:45am a 2:45pm y no podía ausentarse de la escuela a no ser con debida notificación, justa causa y autorización del Colegio. Evidentemente, la "naturaleza, extensión y grado de control que ejercía el patrono" sobre el trabajador era total. Las actividades curriculares y extracurriculares del Colegio eran determinadas y diseñadas por la gerencia, por lo cual, el "grado de juicio o iniciativa que desplegaba" el trabajador era mínimo. La remuneración del señor Whittenburg se denominaba salario y se le pagaba en períodos fijos. Además, recibía un mes de vacaciones con pago y acumulaba días de enfermedad. Es decir, la "forma de compensación" era la típica de un empleado. El señor Whittenburg no tenía facultad alguna de emplear o despedir a otros trabajadores, ni tampoco tenía oportunidad de "incurrir en ganancias" ni tenía "riesgo de pérdidas". La "titularidad del equipo" era del Colegio y la "dependencia de las facilidades suministradas por el principal" era total. De igual forma, el Colegio retenía el pago de contribuciones. Como "cuestión de realidad económica", el Señor Whittenburg dependía "de la empresa para la cual trabajaba". Aunque lo discutiremos

próximamente en más detalle, de la propia <u>faz</u> del contrato suscrito surge un grado de "permanencia de la relación del trabajo" que se aleja de la relación principal-contratista. Finalmente, el señor Whittenburg era un maestro de educación física, es decir, sus servicios eran "una parte integral del negocio del principal" y no "se pueden considerar como un negocio separado o independiente por sí mismos".[131]

En lo anterior no hay ningún indicio de que la relación entre el Colegio y el señor Whittenburg fuese de principal-contratista. Es forzoso concluir que estamos ante una relación patrono-empleado. No obstante, <u>para efectos de la Ley 80</u>, esto es insuficiente. Nos corresponde ahora determinar si estamos ante un empleado bajo contrato por término cierto *bona fide* o si, por el contrario, estamos ante un empleado regular por tiempo indefinido. Como hemos visto, primero corresponde analizar si el patrono presentó prueba suficiente para, mediante preponderancia, derrotar la presunción de que el contrato por tiempo cierto no es *bona fide*. De no presentarse tal prueba o de ésta ser insuficiente, ahí terminará nuestro análisis. En caso de derrotarse la presunción, se analizará si se generó una expectativa de continuidad en empleo. En ambos casos, estaremos ante un empleado contratado por tiempo indeterminado.

---

[131] Todos estos términos provienen de la lista de criterios que nuestra jurisprudencia ha identificado para analizar si una persona es un contratista o un empleado. Véase nota al calce número 37.

Vale recordar que los contratos por término fijo *bona fide* no se presumen. La propia Ley 80 impone al patrono el peso de la prueba de que el contrato por término fijo es *bona fide*. Además, la práctica de contratar empleados por término fijo tiene un objetivo muy particular: suplir una necesidad temporera o coyuntural del patrono.

El patrono se limitó a presentar el Contrato de Servicios Profesionales suscrito por el señor Whittenburg y no aportó prueba adicional para demostrar la naturaleza *bona fide* del mismo. Del expediente no surge que el patrono haya presentado evidencia alguna que ofrezca una explicación de por qué el puesto de maestro de educación física del señor Whittenburg debe ser ocupado de manera temporera. Por tanto, el patrono no cumplió con su carga probatoria.

En segundo lugar, toda la evidencia presentada tiende a <u>reafirmar</u> la presunción establecida por la Ley 80 de que el contrato no es *bona fide*.[132] Una lectura integral del propio Contrato de Servicios Profesionales, única prueba presentada para apoyar las alegaciones del patrono de que el señor Whittenburg no era un empleado regular, demuestra que la relación entre éste y el Colegio no era temporera ni incidental a un término cierto.

Por un lado, la Cláusula número 15 del contrato establece que éste "expirará a su vencimiento y sólo podrá

---

[132] Cabe recordar que el Tribunal de Primera Instancia, como juzgador de los hechos, llegó a la conclusión de que, en efecto, el señor Whittenburg era un empleado regular del Colegio.

ser renovado, a opción de el [*sic*] Colegio, en forma expresa y por escrito y bajo los términos y condiciones que el Colegio lo [*sic*] tenga a bien establecer".[133] Aunque una lectura superficial y aislada de este inciso da la apariencia de que estamos ante un contrato por término fijo, la Cláusula 13 revela otra cosa: "En caso de que el/la maestro(a) esté en su Primer (1er.) año de contrato con el Colegio, el Primer (1er.) Semestre escolar constituirá y se considerará como el período probatorio, al fin de cuyo período el Colegio podrá resolver y dar por terminada [*sic*] este Contrato de Servicios Profesionales, si así lo estimare procedente".[134] Es decir, del propio contrato surge que la expectativa es que la relación de trabajo entre las partes continuará más allá de la vigencia de un año del contrato en particular. Incluso se habla de un período probatorio que, además de ser de por sí indicativo de que el puesto para el cual se le contrata se concibe como una plaza regular de empleo, también indica que habrá relación obrero-patrono más allá de la vigencia individual de cada contrato.

Lo que es más, <u>la práctica y la conducta de las partes indican que, en efecto, la relación de trabajo entre ellas trasciende la vigencia individual de cada contrato</u>. Hemos visto que el señor Whittenburg estuvo un período de 98 días trabajando <u>sin contrato</u>, pues el contrato de 2001-2002 ya había "vencido" en verano de 2002 y no se firmó otro

---

[133] Contrato de Servicios Profesionales. Véase nota al calce número 6.

[134] *Véase* nota al calce número 7.

contrato sino hasta noviembre de ese año. ¿En virtud de qué contrato estaba laborando el señor Whittenburg entre esas fechas? La respuesta es ninguno, porque los contratos firmados eran *pro forma* dado que las labores realizadas por el señor Whittenburg eran las de un empleado regular contratado por tiempo indefinido. No hay otra manera de justificar el trabajo realizado durante ese tiempo. Si éste no fuese el caso, todos los empleados que acudieron a trabajar el 4 de agosto de 2003 lo hicieron con contratos vencidos, y nominalmente despedidos, y no sería hasta noviembre de ese año que serían "re-contratados".[135] Igual pregunta tendríamos que hacer en cuanto a los pagos de salarios que hiciera el Colegio al peticionario durante el período en que formalmente no había contrato vigente. La contestación sería la misma.

Ya hemos visto que la Ley 80 da una voz de alerta en contra del uso de esquemas evasivos que sirvan de subterfugio a los patronos para no cumplir con las obligaciones que impone. La única razón que surge de los hechos del caso de autos de por qué todos los empleados del

---

[135] Por eso es que el Tribunal de Primera Instancia utilizó el mandato del artículo 8 de la Ley 80, 29 L.P.R.A. § 185h, de que toda persona que trabaje sin contrato por más de 90 días –salvo que exista autorización del Secretario del Trabajo y Recursos Humanos– "adquirirá todos los derechos de un empleado tal y como si hubiese sido contratado sin tiempo determinado". No tenemos que discutir la conclusión del Tribunal de Primera Instancia, pues todos los factores indican que desde antes de ese periodo de 98 días ya el señor Whittenburg era un empleado regular por tiempo indefinido del Colegio. No obstante, el mandato del artículo 8 de la Ley 80 es inequívoco: persona que trabaje ese periodo de tiempo sin contrato se convertirá en empleado regular al vencer el mismo.

Colegio están bajo contrato de servicio por término cierto es para no tener que cumplir con la Ley 80. No se ha ofrecido razón académica, administrativa o de otra naturaleza para justificar esa cultura de contratación. No hay duda de que estamos ante un subterfugio, y que la política pública actual es, como correctamente identificó el Juez Asociado Rivera Pérez en García Burgos v. A.E.E.L.A., "desalentar la práctica patronal de evadir las disposiciones remediales de la Ley Núm. 80 mediante la contratación de empleados por un tiempo determinado en circunstancias en que éstos, en la práctica, están desempeñando funciones de duración indeterminada".[136] Resulta evidente, pues, que el señor Whittenburg era un empleado regular del Colegio Nuestra Señora del Carmen. Al no probarse justa causa, su despido fue en violación a la Ley 80.

En cuanto a la expectativa de continuidad en el empleo, hemos visto que todos los trabajadores del Colegio estaban, nominalmente, bajo un Contrato de Servicios Profesionales. Esto incluye a trabajadores docentes, no-docentes y de mantenimiento. Muchos de estos trabajadores han laborado en el Colegio por un sinnúmero de años, a pesar de que son contratados por término fijo. Sin embargo, la costumbre del Colegio era la de renovar los contratos de servicios cada noviembre, a pesar de que las clases comenzaban en agosto. Se trataba de una práctica rutinaria. No cabe duda que la

---

[136] García Burgos v. A.E.E.L.A., supra, Opinión de Conformidad del Juez Asociado Rivera Pérez, pp. 345-347.

expectativa generada, en primer lugar, era que un maestro que empezaba a trabajar en agosto tendría su contrato firmado para noviembre. En segundo lugar, todo indica que la gran mayoría de los empleados del Colegio tenían la expectativa de que al inicio de cada año escolar volverían a sus respectivos trabajos. Eso explica la participación masiva de maestros en las reuniones preparatorias de principios de agosto de 2003, a pesar de que todos tenían vencidos sus respectivos contratos y a nadie se le había renovado aún.

La expectativa de continuidad aparentemente generada opaca el escenario propuesto por el patrono de que, a esa fecha, técnicamente todos estaban cesanteados al no haberse renovado los contratos. Como la presunción en este caso no fue derrotada ya que el patrono no presentó prueba alguna a esos efectos, no hace falta pasar juicio sobre si se generó una expectativa de continuidad en el empleo. La presunción no refutada y la prueba tendente a demostrar que, en efecto, el contrato no era *bona fide*, son suficientes para concluir que el señor Whittenburg era un empleado contratado por tiempo indeterminado y que fue despido sin justa causa, ya que tampoco se presentó prueba alguna para derrotar la presunción de despido injustificado que establece la Ley 80.

El señor Whittenburg sufrió un accidente de tránsito el 15 de junio de 2003, mientras disfrutaba de sus vacaciones pagas. Dicho accidente le inhabilitó para trabajar temporeramente. Como consecuencia del accidente, el

peticionario procuró y recibió tratamiento de la ACAA. Tanto el accidente como el inicio del tratamiento por parte de la ACAA ocurrieron <u>antes</u> del despido del señor Whittenburg. Como hemos visto, desde la fecha en que ocurrió el accidente, el patrono estaba obligado a reservarle el empleo por un periodo de seis meses. No lo hizo. Por el contrario, a pesar de que el peticionario se reportó a la ACAA y que poco después de que le comunicaran de su despido éste informó que disfrutaba los beneficios de dicha Ley, el patrono optó por continuar con sus planes de despedirlo. Al hacerlo, violó la reserva establecida por la Ley ACAA.[137]

En cuanto a los remedios disponibles al señor Whittenburg, en virtud de la Ley ACAA procede su reinstalación y el pago de los salarios dejados de percibir, así como el pago de los daños y perjuicios causados. Para evitar la doble compensación, no operan los remedios provistos por la Ley 80. En cuanto a los salarios dejados de percibir, el Tribunal de Primera Instancia, como parte del diseño del remedio, deberá deducir los salarios que el peticionario devengó entre su despido y la fecha en que se dictó la Sentencia del foro de instancia. Erró el Tribunal de Primera Instancia al excluir prueba sobre este asunto. En cuanto a los daños y perjuicios otorgados por el foro de instancia, resolvemos que, dada las circunstancias particulares de este caso, no se produjeron los daños

---

[137] Cabe recordar que la reserva de la Ley ACAA cubre a una gama más amplia de trabajadores que la Ley 80, pues la Ley ACAA, a diferencia de esta última, opera independientemente de la existencia de una relación obrero-patronal.

reclamados, por lo cual no procede indemnización alguna en esa dirección. Además, entendemos que la prueba presentada a esos efectos no sostiene la cuantía otorgada.

Por las razones previamente expuestas, se revoca al Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para procedimientos ulteriores consistentes con esta Opinión.

Se dictará sentencia de conformidad.


Liana Fiol Matta
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Andrés Whittenburg
Peticionario

v.

Iglesia Católica Apostólica
Romana de Puerto Rico, Colegio
Nuestra Señora del Carmen
Recurridos

*Certiorari*

CC-2008-517

*SENTENCIA*

En San Juan, Puerto Rico a 26 de septiembre de 2011.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se revoca al Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para procedimientos ulteriores consistentes con esta Opinión.

Lo acordó y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera García emitió una opinión concurrente y disidente a la que se unieron la Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Feliberti Cintrón. El Juez Asociado señor Martínez Torres inhibido.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|                                                      |              |
| ---------------------------------------------------- | ------------ |
|                                                      | Certiorari   |
| Andrés R. Whittenburg Guzmán<br>Peticionario         |              |
| v.                                                   | CC-2008-0517 |
| Iglesia Católica Romana de Puerto Rico; Colegio Nuestra Señora del Carmen<br>Recurridos | |

Opinión Concurrente y Disidente emitida por el Juez Asociado señor Rivera García a la que se unen la Jueza Asociada, señora Pabón Charneco, y el Juez Asociado, señor Feliberti Cintrón.

En San Juan, Puerto Rico, a 26 de septiembre de 2011.

El recurso de *certiorari* ante nuestra consideración exige la resolución de tres controversias de carácter medular, a saber: (1) si el contrato laboral otorgado al Sr. Andrés E. Whittenburg Guzmán (señor Whittenburg Guzmán o peticionario) por el Colegio Nuestra Señora del Carmen de Hatillo (Colegio) constituía un contrato por tiempo determinado *bona fide* no sujeto a la presunción de despido injustificado instaurada por el Art. 1 de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 L.P.R.A. sec. 185a-185m, conocida como Ley de Despido Injustificado; (2) si la decisión del Colegio de no renovar el referido contrato

representó un acto de despido injustificado, indemnizable con el pago de la mesada establecido por la Ley Núm. 80, *supra*; y (3) si el Colegio, al no renovar el acuerdo laboral indicado, incurrió en una violación del derecho a la reserva de empleo dispuesto por la Sec. 5 de la Ley Núm. 138 de 26 de junio de 1968, 9 L.P.R.A. secs. 2051-2065, conocida como Ley de Protección Social por Accidentes de Automóviles.[138]

Por entender que el contrato de empleo por tiempo determinado pactado entre el señor Whittenburg Guzmán y el Colegio no era uno *bona fide* exento del ámbito protector de la Ley Núm. 80, *supra*, y concebir que no existió justa causa para el despido del peticionario, *concurro* con la opinión mayoritaria en cuanto a que la no renovación del contrato del peticionario constituyó un despido injustificado.

Empero, difiero del análisis de que el patrono violentó el derecho a la reserva de empleo provisto por la Ley Núm. 138, *supra*. Es mi criterio que el desconocimiento del patrono de que el empleado recibía beneficios al amparo de ese estatuto, demuestra que el despido no fue motivado por la lesión del peticionario - pretexto que el legislador pretendió sancionar mediante la promulgación de la Sec. 5 del referido estatuto. Más bien, el despido encontró su justificación en razones

---

[138] La Ley Núm. 138 de 26 de junio de 1968, 9 L.P.R.A. secs. 2051-2065, conocida como Ley de Protección Social por Accidentes de Automóviles, es administrada por la Administración de Compensaciones por Accidentes de Automóviles (ACAA).

ajenas a las consideraciones de política pública perseguidas por la precitada disposición legal, las cuales sólo legitiman la concesión de una causa de acción al amparo de la Ley Núm. 80, *supra*, sin más.

A la luz de lo esbozado, pasemos a discutir los antecedentes fácticos del caso que nos ocupa.

I

El señor Whittenburg Guzmán trabajó como maestro de educación física del Colegio durante los años escolares 2001 a 2002 y 2002 a 2003. Su relación laboral con la institución educativa para el año escolar que inició en el 2002 y culminó en el 2003, estaba regida por un contrato de servicios profesionales y a tiempo determinado, el cual gozaba de una vigencia de un año, a saber, desde el 8 de agosto de 2002 hasta el 30 de junio del año siguiente.[139] El contrato de empleo fue otorgado por las partes el 14 de noviembre de 2002, a pesar de que el peticionario ya prestaba sus servicios y cobraba por ellos desde el 8 de agosto del mismo año.[140] Según se desprende de la prueba

---

[139] Apéndice V, Petición de *certiorari*, pág. 27.

[140] Según los términos y las condiciones del acuerdo laboral otorgado entre el Sr. Andrés Whittenburg Guzmán (señor Whittenburg Guzmán o peticionario) y el Colegio Nuestra Señora del Carmen de Hatillo (Colegio), el peticionario devengaría un sueldo bruto anual de $12,760.00. Íd., pág. 28. A su vez, el señor Whittenburg Guzmán brindaría clases de lunes a viernes, desde las 7:45 a.m. hasta las 2:45 p.m. Íd.
Como parte de los beneficios concedidos al peticionario, éste gozaría de un mes de vacaciones con paga, el cual sería disfrutado en el mes de junio o julio, según fuese acordado entre el Colegio y el señor Whittenburg Guzmán, y acumularía días de enfermedad de acuerdo a lo provisto por el contrato pactado. Íd., pág. 29. Según lo previsto en la cláusula 15 del indicado acuerdo laboral, el mismo expiraba a su vencimiento y sólo podía ser renovado a opción del Colegio y de acuerdo a los términos y las condiciones que éste tuviese a bien establecer. Íd., pág. 30.

desfilada en el juicio, todos los empleados del Colegio –docentes y no docentes- eran contratados mediante convenios a tiempo determinado, vencederos cada año escolar y otorgados en una fecha posterior al momento en el cual iniciaba la relación obrero-patronal.[141]

El 15 de junio de 2003, durante el periodo de vacaciones, el señor Whittenburg Guzmán sufrió un accidente mientras conducía su motora.[142] A raíz de ello, el peticionario experimentó una dislocación de la muñeca y una fractura radial en el brazo izquierdo.[143] Por causa de las lesiones sufridas, se acogió a los beneficios provistos por la Ley Núm. 138, *supra*, recibiendo servicios de hospitalización y sometiéndose a una intervención quirúrgica.[144]

Posteriormente, el 4 de agosto de 2003, en horas de la tarde, el peticionario asistió al Colegio por primera vez luego de haber sufrido el accidente.[145] En esa

---

[141] Véase, Apéndice X, Petición de *certiorari*, págs. 66-67.

[142] El señor Whittenburg Guzmán laboró en el Colegio hasta el 13 de junio de 2003. Apéndice X, Petición de *certiorari*, pág. 67.

[143] Apéndice I, Petición de certiorari, pág. 2. Véanse, también, Apéndices VI-VII, Petición de *certiorari*, págs. 33-55.

[144] Apéndices VI-VII, Petición de *certiorari*, págs. 33-55. Véase, también, Apéndice XVIII, Petición de *certiorari*, págs. 201-202, Transcripción del Juicio en su Fondo, págs. 101-102.

[145] Apéndice X, Petición de *certiorari*, págs. 67-68. La prueba es altamente conflictiva con relación a la fecha exacta en la cual el peticionario asistió por primera vez al Colegio luego de haberse acogido a los beneficios de la Ley de Protección Social por Accidentes de Automóviles, *supra*. Según el testimonio de la Sra. Carmen Nydia Díaz Pérez, principal del Colegio, el señor Whittenburg Guzmán no asistió a la reunión de empleados celebrada el 4 de agosto de 2003. Apéndice XVIII, Petición de *certiorari*, págs. 130-131, Transcripción del Juicio en su Fondo, págs. 30-31. De acuerdo a la Principal, luego de terminada la reunión de empleados, todos se marcharon y ella nunca vio o interactuó con el señor Whittenburg Guzmán. Íd. Por otro lado, el peticionario arguye lo contrario, testificando en corte que sí

ocasión, la Sra. Carmen Nydia Díaz Pérez, Principal del Colegio, observó que el peticionario tenía su mano vendada y le preguntó si estaba capacitado para trabajar en esas condiciones. Ante la interrogante de la Principal, el empleado se limitó a indicar que había sufrido un accidente de motora.[146] Es oportuno añadir que *nada dijo sobre su obtención de beneficios al amparo de la Ley Núm. 138, supra.*

El día siguiente, el 5 de agosto de 2003, el peticionario regresó al Colegio con el fin de participar en una segunda reunión de empleados.[147] Al culminar la reunión, la señora Díaz Pérez y el señor Whittenburg Guzmán fueron convocados a la Oficina de Administración, con el propósito de reunirse con el Sr. Wilson Ortiz Guzmán, Administrador voluntario del Colegio, y el

---

asistió al Colegio el 4 de agosto de 2003, luego de haber retornado de un hospital en Río Piedras en el cual le removieron ciertos tornillos implantados como consecuencia del accidente. Apéndice XVIII, Petición de *certiorari*, págs. 202-203, Transcripción del Juicio en su Fondo, págs. 102-103. A pesar de la contradicción reseñada, el Tribunal de Primera Instancia le otorgó credibilidad al testimonio del señor Whittenburg Guzmán con relación a que asistió al Colegio el día indicado, en horas de la tarde. Apéndice X, Petición de *certiorari*, págs. 67-68.

[146] *No obstante, contrario a lo creído por el foro sentenciador y aún descansando únicamente en el testimonio del señor Whittenburg Guzmán, la transcripción del juicio en su fondo no permite concluir que el peticionario le informó a la principal que se había acogido a los beneficios de la Ley Núm. 138, supra.* Véase, Apéndice XVIII, Petición de *certiorari*, págs. 202-203, Transcripción del Juicio en su Fondo, págs. 102-103.

[147] La primera reunión de personal fue celebrada el 4 de agosto de 2003. El peticionario no asistió a dicha reunión. Lo anterior se desprende de la ausencia de la firma del señor Whittenburg Guzmán en la hoja de asistencia. Véase, Apéndice VIII, Petición de *certiorari*, págs. 56-58. No fue sino en horas de la tarde que, luego de un proceso invasivo y doloroso -la remoción de tornillos-, el peticionario alega haber acudido al Colegio.

sacerdote Fernando Morell Domínguez, Director de la institución educativa.[148]

Una vez reunidos, el sacerdote Morell Domínguez le informó al peticionario que su contrato de empleo no sería renovado para el año escolar 2003 a 2004. Al ser interrogados en el juicio sobre los motivos por los cuales el contrato del peticionario no fue renovado, los miembros de la administración del Colegio expresaron que no existían razones particulares para la misma.[149] Más allá de que no estaban interesados en renovar el contrato del señor Whittenburg Guzmán, la señora Díaz Pérez declaró que había recibido quejas de ciertos padres que alegaban que el peticionario, en ocasiones, había dejado a sus estudiantes solos y sin supervisión durante su hora de clases. No obstante, del expediente no surge evidencia de que el peticionario recibió amonestación o disciplina de tipo alguno con relación a esa queja. Más aún, el señor Whittenburg Guzmán nunca fue evaluado en sus dos años como maestro del Colegio.[150]

Inmediatamente después de ser informado sobre el despido, y en un exabrupto por la decisión tomada, el señor Whittenburg Guzmán señaló *por primera vez* que se encontraba recibiendo los beneficios de la Ley Núm. 138,

---

[148] Véanse: Apéndice XVIII, Petición de *certiorari*, págs. 131-133, 203-209 Transcripción del Juicio en su Fondo, págs. 31-33, 103-109; Apéndice X, Petición de *certiorari*, pág. 69.

[149] Véase, Apéndice XVIII, Petición de *certiorari*, págs. 133-134, 164, Transcripción del Juicio en su Fondo, págs. 33-34, 64.

[150] Véase, Apéndice XVIII, Petición de *certiorari*, págs. 147-148, 197, Transcripción del Juicio en su Fondo, págs. 47-48, 97.

*supra*. A pesar de que en el mes de junio la abuela del peticionario le había notificado al sacerdote Morell Domínguez que su nieto había sufrido un accidente de motora y que se encontraba hospitalizado,[151] el peticionario nunca entregó documento alguno o comunicó verbalmente –hasta minutos después del despido– que se había acogido a las protecciones de la Ley Núm. 138, *supra*.

Este hecho quedó constatado en el juicio cuando el propio peticionario –a preguntas del Juez– reconoció que nunca le había comunicado al sacerdote –Director del Colegio y encargado de toda decisión final con relación a la terminación de un empleo–, o a persona alguna de la gerencia de la institución educativa, que había acudido a la Administración de Compensaciones por Accidentes de Automóviles (ACAA) para recibir beneficios.[152] Aunque ciertamente los administradores del Colegio conocían que el señor Whittenburg Guzmán había sufrido un accidente de

---

[151] Apéndice XVIII, Petición de *certiorari*, págs. 187-192, Transcripción del Juicio en su Fondo, págs. 87-92. Del testimonio de la abuela del peticionario surge que ésta nunca le dijo al sacerdote Fernando Morell Domínguez que su nieto se había acogido a los beneficios de la Ley Núm. 138, *supra*. Más bien, el 16 de junio de 2003, la abuela del señor Whittenburg Guzmán acudió al Colegio y sólo le informó al sacerdote de la ocurrencia del accidente de motora y de la subsiguiente hospitalización. Íd. Debido a que la ACAA hizo una determinación de incapacidad el 30 de junio de 2003, no había manera alguna que la abuela, al momento de comunicarle al sacerdote sobre el accidente, conociera que el peticionario se había acogido a los beneficios emitidos por la ACAA.

[152] Apéndice XVIII, Petición de *certiorari*, págs. 230-233, Transcripción del Juicio en su Fondo, págs. 130-133. La prueba es clara en demostrar que el peticionario, al interactuar con miembros del cuerpo gerencial del Colegio, se limitaba a informar que había sufrido un accidente de motora, mas nada informaba sobre su acogimiento a las protecciones brindadas por la Ley Núm. 138, *supra*. Véase, Apéndice XVIII, Petición de *certiorari*, págs. 130, 158, 164-166, 168-169, 173-174, Transcripción del Juicio en su Fondo, págs. 30, 58, 64-66, 68-69, 73-74.

motora, no tenían conocimiento de los servicios que la ACAA le estaba brindando.[153]

Como consecuencia de los incidentes fácticos, el 19 de abril de 2004 el peticionario presentó ante el Tribunal de Primera Instancia una querella al amparo de la Ley Núm. 80, *supra*, y la Ley Núm. 138, *supra*.[154] Esencialmente, alegó que la no renovación de su contrato de empleo representó un despido injustificado, según ese término es consignado en la Ley Núm. 80, *supra*, ya que la naturaleza de su empleo era por tiempo indefinido sujeto a las protecciones del estatuto. Además, argumentó que su despido se dio durante el tiempo en el cual se encontraba cobijado por el derecho a la reserva de empleo y que la destitución era contraria al estado de derecho vigente. Consecuentemente, el peticionario solicitó el pago de la mesada, los salarios dejados de percibir, una indemnización por concepto de los daños y perjuicios alegadamente sufridos, y la restitución en su antiguo puesto.[155]

En contestación a la querella del peticionario, el 2 de julio de 2004, el patrono argumentó que el señor Whittenburg Guzmán había sido contratado por tiempo determinado y sin expectativa alguna de continuidad.[156] A

---

[153] Según el señor Whittenburg Guzmán, aunque la administración desconocía de tal hecho, sus compañeros de trabajo estaban enterados. Apéndice XVIII, Petición de *certiorari*, pág. 232, Transcripción del Juicio en su Fondo, pág. 132.

[154] Véase, Apéndice I, Petición de *certiorari*, págs. 1-3.

[155] Véase, Íd.

su vez, el Colegio añadió que, debido a que la relación entre el patrono y el peticionario era de naturaleza contractual, no eran de aplicación las leyes laborales de nuestro ordenamiento legal. Según el patrono, una vez venció el término del acuerdo laboral, el patrono no estaba obligado a renovarle el contrato de trabajo al peticionario y tampoco reservarle el empleo.

Luego de celebrado el juicio en su fondo, el 24 de abril de 2007, el Tribunal de Primera Instancia emitió su dictamen.[157] El foro primario resolvió, en virtud del Art. 8 de la Ley Núm. 80, *supra*, que el peticionario era un empleado contratado por tiempo indefinido y cobijado por las protecciones de la Ley 80, *supra*. Ello, debido a que el periodo de empleo probatorio consignado en el contrato laboral sobrepasaba el máximo de 90 días permitidos por el estatuto.[158] Igualmente, el tribunal determinó que el peticionario no era un contratista independiente, según los criterios esbozados por esta Curia en sus pronunciamientos jurisprudenciales.

Cónsono con su dictamen, el foro sentenciador ordenó al patrono a: (1) reinstalar al peticionario en su puesto; (2) pagarle al señor Whittenburg Guzmán todos los salarios dejados de percibir desde el 5 de agosto de 2003; (3) sufragarle al peticionario la cantidad de $20,000.00 por concepto de sufrimientos y angustias mentales; y (4)

---

[156] Véase, Apéndice II, Petición de *certiorari*, págs. 4-6.

[157] Su decisión fue notificada el 26 de abril de 2007.

[158] Apéndice X, Petición de *certiorari*, págs. 72-73.

satisfacer el pago de las costas, gastos, e intereses, al igual que un 25% de las sumas adjudicadas por concepto de honorarios de abogado.[159]

Inconforme con esa sentencia, el Colegio recurrió en alzada al Tribunal de Apelaciones. Atendido el recurso, el foro apelativo intermedio revocó al foro primario. Resolvió, en síntesis, que el contrato de empleo del señor Whittenburg Guzmán era un contrato por tiempo determinado *bona fide*, el cual no otorgaba una expectativa de continuidad en el empleo. Asimismo, colegió que no era de aplicación la Ley Núm. 80, *supra*. En cuanto al derecho a la reserva de empleo, concluyó que la relación obrero-patronal había vencido el 13 de junio de 2003, días antes de ocurrir el accidente. Razonó que, al no existir una relación de empleo a la fecha del accidente, no hubo una violación a ese derecho. Finalmente, el Tribunal revocó la compensación por daños y perjuicios por entender que la prueba presentada por el peticionario era insuficiente.

Insatisfecho con ese dictamen, el peticionario recurrió ante nos y adujo que el tribunal apelativo intermedio incurrió en los siguientes errores:

**ERRÓ EL TRIBUNAL DE APELACIONES AL REVOCAR LA SENTENCIA DEL TRIBUNAL DE PRIMERA INSTANCIA, DESCARTANDO LAS DETERMINACIONES DE HECHOS DEL FORO SENTENCIADOR, SIN FUNDAMENTO ALGUNO Y DETERMINANDO QUE EL PETICIONARIO ERA UN EMPLEADO CONTRATADO POR TIEMPO DETERMINADO SIN**

---

[159] Íd., págs. 76-77.

**EXPECTATIVA DE CONTINUIDAD Y NO PROTEGIDO POR LA LEGISLACIÓN LABORAL DE LA LEY # [sic.] 80, 29 L.P.R.A. 185.**

**ERRÓ EL TRIBUNAL DE APELACIONES AL RESOLVER QUE EL PETICIONARIO NO GOZABA DE RESERVA DE EMPLEO AL AMPARO DE LA LEY DE COMPENSACIONES DE ACCIDENTES POR ACCIDENTES [sic.] (ACAA) 9 L.P.R.A. SEC. 2054, POR NO SER EMPLEADO AL MOMENTO DEL ACCIDENTE.[160]**

Teniendo presente los antecedentes fácticos del caso ante nos, pasemos a elaborar el marco jurídico aplicable a las controversias enunciadas.

II

*A. El contrato por término fijo u obra cierta y la Ley Núm. 80, supra.*

En nuestro sistema legal, existen dos maneras fundamentales mediante las cuales puede manifestarse la otorgación de un contrato laboral individual. Específicamente, los acuerdos laborales pueden ser otorgados: (1) por un periodo de tiempo indeterminado; o (2) para un tiempo fijo, o para un proyecto u obra cierta.[161] Como bien apuntalamos en <u>López Fantauzzi v.</u>

---

[160] Petición de *certiorari*, pág. 5.

[161] R. Delgado Zayas, <u>Apuntes para el estudio de la legislación protectora del trabajo en el derecho laboral puertorriqueño</u>, San Juan, Ed. Ramallo Bros. Printing, Inc., 2007, págs. 21-22; Art. 1473 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 4111.

100% Natural,[162] "la protección que gozará el obrero en la tenencia y seguridad de su empleo dependerá del tipo de contrato laboral pactado entre el patrono y éste".[163]

En primer lugar, cuando el contrato otorgado es uno por *tiempo indeterminado* y el obrero trabaje mediante remuneración de alguna clase, éste estará cubierto por las protecciones provistas en la Ley Núm. 80, *supra*.[164] De tal manera, todo despido del trabajador se presumirá injustificado una vez el obrero establezca el hecho base del despido. Así, del patrono no lograr rebatir dicha presunción,[165] éste vendrá obligado a indemnizar al trabajador con una compensación comúnmente denominada como *la mesada*.[166]

Por otro lado, cuando el acuerdo laboral es de aquellos otorgados para un *tiempo fijo*, *o para un proyecto u obra cierta*, la Ley Núm. 80, *supra*, no será de aplicación.[167] Más bien, nuestro ordenamiento legal bifurcará la protección otorgada a tales empleados, dependiendo de la clasificación ocupacional que ejerzan. Así, en aquellos casos en donde el trabajador asalariado

---

[162] 2011 T.S.P.R. 40, pág. 12, 181 D.P.R. ___ (2011).

[163] Íd.

[164] 29 L.P.R.A. sec. 185a. Véase, también, Vélez Cortés v. Baxter Healthcare Co., 2010 T.S.P.R. 110, 179 D.P.R. ___ (2010).

[165] El patrono podrá rebatir dicha presunción al articular que hubo una razón justificada para el despido, según éstas son enumeradas en el Art. 2 de la Ley Núm. 80, *supra*, 29 L.P.R.A. sec. 185b.

[166] Véase, 29 L.P.R.A. sec. 185a.

[167] Véase, Departamento del Trabajo y Recursos Humanos, Guía revisada para la aplicación de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 2000, pág. 57.

desempeñe labores semejantes a aquellas llevadas a cabo por un artesano, menestral o labrador, "el Art. 1476 del Código Civil,[168]... representará la fuente principal de [su] protección".[169]

Según dispone el citado artículo, esos empleados no podrán ser despedidos sin justa causa mientras esté vigente el término de sus contratos.[170] De ser despedidos injustificadamente durante dicho periodo, tendrán derecho al resarcimiento de los daños ocasionados por el quebrantamiento del contrato, los cuales se determinarán sobre la base de los salarios dejados de recibir por motivo del despido, más cualquier otro daño que puedan establecer.[171]

Con relación a todo otro tipo de empleado contratado *por tiempo determinado o para obra cierta*, cuyas labores no requieran destrezas manuales como aquellas consignadas en el Art. 1476 del Código Civil, *supra*, su protección a la tenencia de su empleo estará regida –en primera instancia– por el Art. 1 de la ley Núm. 80, *supra*.[172] Dicho articulado provee lo siguiente:

---

[168] Art. 1476 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 4111. ("Los empleados de labranza, menestrales, artesanos y demás trabajadores asalariados por cierto término o para cierta obra no pueden despedirse ni ser despedidos antes del cumplimiento del contrato sin justa causa").

[169] López Fantauzzi v. 100% Natural, 2011 T.S.P.R. 40, págs. 14-15, 181 D.P.R. ___ (2011), citando a, Soc. de Gananciales v. Vélez & Asoc., 145 D.P.R. 508, 518-519 (1998); Camacho Arroyo v. E.L.A., 131 D.P.R. 718, 728-731 (1992).

[170] López Fantauzzi v. 100% Natural, supra, pág. 15.

[171] Íd.

[172] Íd., pág. 17.

... el mero hecho de que un empleado preste servicios al amparo de un contrato por tiempo determinado por sí solo no tendrá el efecto automático de privarle de la protección de la [Ley Núm. 80, *supra*,] *si la práctica y circunstancias involucradas u otra evidencia en la contratación fueren de tal naturaleza que tiendan a indicar la creación de una expectativa de continuidad de empleo o aparentando ser un contrato de empleo por tiempo indeterminado bona fide*. En estos casos los empleados así afectados se considerarán como si hubieren sido contratados sin tiempo determinado. *Excepto cuando se trate de empleados contratados por un término cierto bona fide o para un proyecto u obra cierta bona fide*, toda separación, terminación o cesantía de empleados contratados por término cierto o proyecto u obra cierta, o la no renovación de su contrato, se presumirá que constituye un despido sin justa causa regido por la [Ley Núm. 80, *supra*].[173]

Al analizar dicha disposición legal en <u>López Fantauzzi v. 100% Natural</u>, supra, expusimos lo siguiente:

De tal manera, el legislador prohíbe el uso de los contratos por término fijo renovados a voluntad del patrono mensual o anualmente de forma frecuente, como mecanismo de subterfugio para evadir el cumplimiento de la Ley Núm. 80, *supra*. Es por ello que, para evitar que los

---

[173] (Énfasis nuestro.) 29 L.P.R.A. sec. 185a.

patronos diseñen contratos por término fijo u obra cierta que eludan el ámbito de protección provisto por la Ley Núm. 80, *supra*, será crucial que no tan sólo se catalogue un contrato como uno por término fijo por así disponerlo su título, sino que resulta imperativo examinar *si la práctica y las circunstancias envueltas u otra evidencia en la contratación han creado en el empleado una expectativa de continuidad de empleo*. Además, el patrono deberá rebatir una presunción instaurada por el Art. 1 de la Ley Núm. 80, *supra*, la cual establece que todo despido, separación, terminación, cesantía de un empleado contratado por tiempo determinado, o la no renovación de su contrato, se considerará como una actuación sin justa causa. Si el patrono no rebate tal presunción, el obrero será merecedor de las protecciones provistas por la Ley Núm. 80, *supra*, incluyendo la mesada.[174]

Una vez establecida la presunción previamente indicada, el patrono sólo podrá rebatirla si logra establecer que el contrato otorgado por tiempo determinado o para proyecto u obra cierta es uno *bona fide*. Según el Art. 11 de la ley Núm. 80, *supra*, un contrato *bona fide* es aquel que: (1) se emite por escrito; (2) en o antes del primer término o jornada de trabajo del empleado; y (3) que ha sido otorgado con el propósito -y así se hace constar- de (a) sustituir durante su ausencia a un empleado en el uso de licencia establecida por ley o por

---

[174] López Fantauzzi v. 100% Natural, *supra*, págs. 17-18.

el patrono, (b) llevar a cabo tareas extraordinarias o de duración cierta, tales como —a modo de ejemplo— los inventarios anuales, la reparación de equipo, maquinaria o las facilidades de la empresa, el embarque o desembarque casual de carga y el trabajo en determinadas épocas del año como Navidad, o (c) para cumplir con las órdenes temporeras de aumentos de producción y cualquier otro proyecto o actividad particular de corta duración o de duración cierta fija.[175]

"Si el patrono no logra establecer que el contrato por término fijo es uno *bona fide* o, en su lugar, que existió justa causa para el despido, deberá indemnizar al obrero con la mesada, según lo ordena la Ley Núm. 80, *supra*".[176] Por el contrario, si el patrono establece que el contrato por término fijo es uno *bona fide*, entonces dicho pacto laboral deberá ser examinado a la luz de las normas generales del Derecho de Obligaciones y Contratos de nuestro Código Civil.[177]

B. *La Ley Núm. 138, supra, y el derecho a la reserva de empleo.*

La Ley de Protección Social por Accidentes de Automóviles, *supra*, fue promulgada con el propósito fundamental de establecer un sistema de seguro y compensación por accidentes de tránsito,[178] el cual

---

[175] 29 L.P.R.A. sec. 185k. Véase, también, Íd., pág. 19.

[176] López Fantauzzi v. 100% Natural, supra, págs. 19-20.

[177] Íd., pág. 16, citando a Soc. de Gananciales v. Vélez & Asoc., supra.

"[redujera] a un mínimo los trágicos efectos económicos y sociales producidos por [éstos] sobre la familia y demás dependientes de sus víctimas".[179] El legislador procuró suplir a las víctimas de un accidente automotriz -y a sus dependientes- un alivio que las librara del desamparo y desvalimiento económico que arriba como consecuencia de una tragedia de tal naturaleza, mediante la concesión de servicios médico-hospitalarios, ingresos y un surtido de beneficios adicionales.[180]

En la consecución de dicho fin loable, y en aras de atemperar la referida pieza legislativa a situaciones no concebidas al promulgarse originalmente la Ley Núm. 138, *supra*, la Asamblea Legislativa aprobó la Ley Núm. 45 de 26 de junio de 1987, con el propósito complementario de adicionar una clausula (b) al inciso (3) de la sección 5 de la ley bajo examen. Como resultado de la enmienda discutida, hoy la Sec. 5 de la Ley de Protección Social por Accidentes de Automóviles, *supra*, le reconoce a toda persona lesionada por motivo de un accidente automotriz, dos derechos de carácter independiente, a la vez que le impone al patrono dos obligaciones fundamentales, a saber: (1) la obligación del patrono reservarle a la víctima el empleo que ocupaba a la fecha de su incapacidad; y (2) la prerrogativa que la víctima posee de solicitar su

---

[178] Breviario, Ley Núm. 138 de 26 de junio de 1968, Leyes de Puerto Rico, pág. 349.

[179] Exposición de Motivos, Ley Núm. 45 de 26 de junio de 1987, Leyes de Puerto Rico, pág. 158.

[180] Íd.

reinstalación en su antiguo puesto una vez constate su cumplimiento con determinados requisitos estatutarios.[181]

Concretamente, en los casos de incapacidad cubiertos por la Ley Núm. 138, *supra*, si el lesionado estuviese empleado, su patrono vendrá obligado a reservarle su empleo por un término de caducidad de 6 meses,[182] el cual empieza a transcurrir desde el *momento en que comienza su incapacidad*.[183] A la par, una vez activado el derecho a la reserva de empleo, el patrono deberá reinstalar al empleado en su antiguo puesto, siempre y cuando éste cumpla con las siguientes condiciones:

---

[181] 9 L.P.R.A. sec. 2054 (3) (b). Véanse, también: Rivera Rivera v. Insular Wire Products, Corp., 158 D.P.R. 110, 120 (2002); Rivera v. Blanco Vélez Stores, Inc., 155 D.P.R. 460, 467 (2001); Santos Berríos v. Lederle Piperacillin, Inc., 153 D.P.R. 812, 822 (2001); Cuevas Santiago v. Ethicon, 148 D.P.R. 839, 846-847 (1999); García Díaz v. Darex, 148 D.P.R. 364, 378 (1999); Rodríguez Rosa v. Méndez & Co., 147 D.P.R. 734, 739-741 (1999); Torres González v. Star Kist Caribe, Inc., 134 D.P.R. 1024, 1029-1030 (1994); Carrón Lamoutte v. Co. de Turismo del E.L.A., 130 D.P.R. 70, 77-78 (1992); Santiago v. Kodak Caribbean, Ltd., 129 D.P.R. 768, 769-770 (1992).
Las citas que anteceden corresponden a nuestras interpretaciones jurisprudenciales de la Sec. 5-A de la Ley Núm. 45, infra. Debido a la similitud de dicho estatuto con la Sec. 5 de la Ley Núm. 138, *supra*, podemos aplicar dichos principios al caso de autos por vía de la analogía.

[182] Según discutiremos más adelante, la Sec. 5 de la Ley Núm. 138, *supra*, comparte un lenguaje similar en su naturaleza con aquel esbozado en la Sec. 5-A de la Ley Núm. 45 de 18 de abril de 1935, 11 L.P.R.A. sec. 7, según enmendada, conocida como Ley de Compensaciones por Accidentes de Trabajo; la Sec. 3 de la Ley Núm. 139 de 26 de junio de 1968, 11 L.P.R.A. sec. 203, según enmendada, conocida como Ley de Beneficio por Incapacidad Temporal, y el Art. 16 de la Ley Núm. 428 de 15 de mayo de 1950, 29 L.P.R.A. sec. 693a, según enmendada, conocida como Ley de Seguro Social para Choferes y otros Empleados.
Ante dicha semejanza, procede interpretar que el término de 6 meses dispuesto por la Sec. 5 de la Ley Núm. 138, *infra*, es un término de caducidad no sujeto a interrupción, tal y como hemos resuelto en cuanto al término de 12 meses del derecho a la reserva de empleo dispuesto en el Art. 5-A de la Ley Núm. 45, *supra*.
Véanse: Rivera v. Blanco Vélez Stores, Inc., supra, págs. 468-469; Santos *et al.* v. Lederle, supra, pág. 823; Cuevas Santiago v. Ethicon, supra, pág. 849; Torres González v. Star Kist Caribe Inc., supra, pág. 1036.

[183] 9 L.P.R.A. sec. 2054 (3) (b).

(i) [q]ue... requiera al patrono que lo reponga en su empleo dentro del término de quince (15) días, *contados a partir de la fecha en que fuere dado de alta*, y siempre y cuando que dicho requerimiento no se haga después de transcurridos seis (6) meses desde la fecha de comienzo *de la incapacidad*;

(ii) que... esté mental y físicamente capacitado para ocupar dicho empleo en el momento en que solicite del patrono dicha reposición, y

(iii) que dicho empleo subsista al momento en que... solicite su reposición. Se entenderá que el empleo subsiste cuando el mismo esté vacante o lo ocupe otro trabajador. Se presumirá que el empleo estaba vacante cuando el mismo fuere cubierto por otro trabajador dentro de los treinta (30) días siguientes a la fecha en que se hizo el requerimiento de reposición.[184]

Si el patrono incumpliese con las obligaciones descritas, vendrá obligado a responder al empleado o a sus beneficiarios mediante el pago de los salarios que dicho trabajador hubiere devengado de haber sido reinstalado.[185] Igualmente, el empleador estará sujeto a responder por todos los daños y perjuicios que su conducta le haya ocasionado al empleado.[186]

---

[184] Íd.

[185] Íd.

[186] Íd.

La disposición legal indicada comparte un lenguaje semejante en su naturaleza a aquel esbozado por el legislador en diversas leyes destinadas a proveer distintos tipos de seguros públicos y ocupacionales. Tales leyes han sido promulgadas con el fin de instrumentar la garantía constitucional consignada en la Sec. 16 del Art. II de la Constitución de Puerto Rico,[187] la cual establece el derecho de todo trabajador a recibir protección contra riesgos para su salud e integridad personal.[188]

Precisamente, el contenido de la Sec. 5 de la Ley Núm. 138, *supra*, es afín con aquel dispuesto en la Sec. 5-A de la Ley Núm. 45 de 18 de abril de 1935, 11 L.P.R.A. sec. 7, según enmendada, conocida como Ley de Compensaciones por Accidentes de Trabajo; la Sec. 3 de la Ley Núm. 139 de 26 de junio de 1968, 11 L.P.R.A. sec. 203, según enmendada, conocida como Ley de Beneficio por Incapacidad Temporal, y el Art. 16 de la Ley Núm. 428 de 15 de mayo de 1950, 29 L.P.R.A. sec. 693a, según enmendada, conocida como Ley de Seguro Social para Choferes y otros Empleados. Debido a la *similitud* que comparten los estatutos esbozados, resulta necesario brindarles el mismo trato hermenéutico, examinándolas en

---

[187] Art. II, Sec. 16, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 369.

[188] Véanse: Rivera Rivera v. Insular Wire Products, Corp., 158 D.P.R. 110, 117 (2002); Rivera v. Blanco Vélez Stores, Inc., supra, pág. 466; Matías Martí v. Mun. de Lares, 150 D.P.R. 546, 552-553 (2000); Cuevas Santiago v. Ethicon, supra, pág. 845; García Díaz v. Darex Puerto Rico Inc., 148 D.P.R. 364, 374 (1999); Torres González v. Star Kist Caribe, Inc., supra, pág. 1029.

conjunto conforme a lo dispuesto en el Art. 18 del Código Civil de Puerto Rico,[189] para así esclarecer su sentido.[190] Amparados en dicho acercamiento interpretativo, pasemos a elaborar -por analogía- algunos principios generales sobre el derecho a la reserva de empleo y la reinstalación, dispuesto por la Sec. 5 de la Ley Núm. 138, *supra*.

*1. Principios generales del derecho a la reserva de empleo y la reinstalación.*

Para que una víctima de un accidente vehicular pueda acogerse a los beneficios delineados, resulta imprescindible que ésta cumpla con las siguientes exigencias: (1) que esté empleada al momento de sufrir su incapacidad; (2) que la incapacidad la inhabilite para trabajar; (3) que se acoja a los beneficios provistos por la Ley Núm. 138, *supra*; (4) que dentro de los 15 días siguientes a haber sido dada de alta definitivamente y autorizada a trabajar por la ACAA, la víctima solicite a su patrono su reinstalación en su antiguo puesto; (5) que dicho requerimiento de reposición se haga dentro de los 6 meses de haber sufrido la incapacidad; (6) que al solicitar su reposición la víctima esté física y mentalmente capacitada para desempeñarse en las funciones

---

[189] 31 L.P.R.A. sec. 18.

[190] Laracuente v. Pfizer, 160 D.P.R. 195, 221 (2006), citando a, Zambrana Maldonado v. E.L.A., 129 D.P.R. 740 (1992); Mojica Sandoz v. Bayamón Federal Savs., 117 D.P.R. 110 (1986); Beauchamp v. Holsum Bakers of P.R., 116 D.P.R. 522 (1985). Véase, también, Torres González v. Star Kist Caribe, Inc., supra, págs. 1035-1036.

del empleo que ocupaba; y (7) que dicho empleo subsista al momento que la víctima solicite su reinstalación.[191]

El motivo central de las protecciones bajo análisis emana de un interés por parte de la Asamblea Legislativa de garantizar que un trabajador lesionado e inhabilitado por causa de un accidente automotriz no pierda su trabajo mientras se encuentra *ausente de éste* procurando su recuperación.[192] Conocido es "que, de ordinario, la inhabilitación de un empleado *para continuar llevando a cabo su trabajo* constituye una razón justificada para su despido".[193] Es por ello que, mediante la legislación bajo examen, el legislador le impide al patrono ejercer su facultad ordinaria para despedir al obrero lesionado, requiriéndole, en su lugar, que le reserve el empleo por un término de 6 meses para permitir que el empleado se recupere, sin temor a ser despedido.[194]

No obstante, el ámbito de protección instaurado por la Sec. 5 de la Ley Núm. 138, *supra*, no es absoluto. Más bien, el legislador procuró alcanzar un balance entre los intereses de la víctima del accidente automotriz y

---

[191] 9 L.P.R.A. sec. 2054 (3) (b). Véanse, también: Rivera Rivera v. Insular Wire Products, Corp., supra, pág. 120; Rivera v. Blanco Vélez Stores, Inc., supra, págs. 467-468; Cuevas Santiago v. Ethicon, supra, pág. 847; Rodríguez Rosa v. Méndez & Co., supra, pág. 741; Torres González v. Star Kist Caribe, Inc., supra, pág. 1030.

[192] Rivera v. Blanco Vélez Stores, Inc., supra, pág. 470; Cuevas Santiago v. Ethicon, supra, págs. 854 y 856 (Opinión Disidente emitida por el Juez Asociado Señor Fuster Berlingeri).

[193] (Énfasis nuestro.) García Díaz v. Darex Puerto Rico Inc., supra, pág. 377.

[194] Cuevas Santiago v. Ethicon, supra, pág. 845; García Díaz v. Darex Puerto Rico Inc., supra, pág. 377; Carrón Lamoutte v. Co. de Turismo del E.L.A., pág. 78. Véase, también, Rojas de Colón v. Méndez & Co., 115 D.P.R. 50, 53 (1984).

aquellos del patrono.[195]  A esos efectos, dicha legislación persigue, por un lado, "proteger al obrero lesionado para que éste 'no tenga que confrontarse... con la incertidumbre indeseable de que por haber sufrido dicho accidente, su patrono lo despida sin justa causa del empleo o que cuando éste regrese dado de alta no tenga trabajo'",[196] logrando así "un ambiente de tranquilidad en el cual el obrero pueda recuperarse con mayor celeridad".[197]  A su vez, la Asamblea Legislativa también se propuso no imponerle al patrono la onerosidad de tener que reservar indefinidamente el empleo del obrero lesionado.[198]

A la luz de esas consideraciones, el patrono está impedido de despedir al obrero durante el término de 6 meses, una vez se active el derecho a la reserva de empleo.  Sin embargo, podrá despedir a un empleado durante dicho término por actos anteriores al accidente sufrido, o por actos posteriores a éste, siempre y cuando el patrono tenga una justa causa para su determinación.[199]  Ello,

---

[195] Rivera Rivera v. Insular Wire Products, Corp., supra, pág. 119; Rivera v. Blanco Vélez Stores, Inc., supra, pág. 469; Cuevas Santiago v. Ethicon, supra, pág. 847; García Díaz v. Darex Puerto Rico Inc., supra, pág. 377; Torres González v. Star Kist Caribe, Inc., supra, pág. 1033.

[196] Santiago v. Kodak Caribbean, Ltd., supra, pág. 770.  Véanse, también: Rivera Rivera v. Insular Wire Products, Corp., supra, pág. 121; García Díaz v. Darex Puerto Rico Inc., supra, pág. 377; Rodríguez Rosa v. Méndez & Co., supra, pág. 741.

[197] Santos et al. v. Lederle, supra, pág. 823; García Díaz v. Darex Puerto Rico Inc., supra, pág. 377.  Véase, también: Rodríguez Rosa v. Méndez & Co., supra, pág. 745.

[198] Santiago v. Kodak Caribbean, Ltd., supra, págs. 770-771.

[199] Rivera v. Blanco Vélez Stores, Inc., supra, pág. 468; García Díaz v. Darex Puerto Rico Inc., supra, pág. 380; Rodríguez Rosa v. Méndez &

pues, "aunque el despido de un empleado esté prohibido por encontrarse en una situación protegida, si existe justa causa para despedirlo, dicha prohibición cede".[200] Asimismo, una vez el empleado haya sido dado de alta por la ACAA, éste se verá en la obligación de solicitar su reinstalación dentro del término de 15 días. Tal exigencia pretende "evitar que el obrero, a sabiendas de que el patrono le tiene que reservar el empleo durante [6] meses... se aproveche de este beneficio y no le notifique prontamente de su disponibilidad para retornar al empleo".[201]

En apretada síntesis, un despido que no esté fundado sobre una justa causa y que ocurra dentro del término de 6 meses impuesto al patrono para que le reserve el empleo al lesionado, será ilegal y exigirá las compensaciones previamente dispuestas.[202] "No obstante, una vez transcurrido [el término de 6 meses de reserva de empleo], el patrono está en la libertad de despedir al obrero", sin penalidad de tipo alguna.[203] De no haber transcurrido el

---

Co., supra, pág. 741; Santiago v. Kodak Caribbean, Ltd., supra, pág. 770.
        Aunque la Ley Núm. 138, supra, no define el concepto justa causa, nuestra jurisprudencia ha reconocido que, en tales circunstancias, corresponde recurrir a otras leyes in pari materia. García Díaz v. Darex Puerto Rico, Inc., supra, pág. 381. Por tal motivo, en controversias al amparo de la Sec. 5 de la Ley Núm. 138, supra, el término justa causa será definido a la luz de las circunstancias enumeradas en el Art. 2 de la Ley Núm. 80, supra, 29 L.P.R.A. sec. 185b. Íd.

[200] (Citaciones internas omitidas). García Díaz v. Darex Puerto Rico Inc., supra, págs. 380-381.

[201] Rivera Rivera v. Insular Wire Products, Corp., supra, pág. 121.

[202] Santos et al. v. Lederle, supra, pág. 823.

[203] Íd.

término indicado, el empleado tiene la obligación de solicitar su reinstalación dentro de los 15 días de haber sido dado de alta. Coetáneamente, dicho trabajador deberá constatar que se encuentra física y mentalmente capacitado para desempeñarse en las funciones del empleo que ocupaba y que dicho puesto está vacante, según tal término es definido por el estatuto bajo examen.

Finalmente, cabe recordar que la Sec. 5 de la Ley Núm. 138, *supra*, por ser un estatuto de carácter remedial, debe interpretarse liberalmente a favor del obrero.[204] No obstante, "'cuando la ley es clara y libre de toda ambigüedad la letra de ella no deber ser menospreciada por su espíritu'".[205] Habiendo establecido los principios generales aplicables al derecho a la reserva de empleo y la reinstalación instaurado en el estatuto bajo análisis, pasemos a examinar cuándo se activa el referido derecho.

*2. La incapacidad que activa el derecho a la reserva de empleo al amparo de la Ley Núm. 138, supra.*

A pesar de compartir un lenguaje casi idéntico en su naturaleza con aquel articulado en la Sec. 5-A de la Ley de Compensaciones por Accidentes de Trabajo, *supra*, la Sec. 5 de la Ley Núm. 138, *supra*, goza de un contenido particular con relación al momento en el cual comienza a

---

[204] Íd., pág. 825, citando a, <u>Cuevas Santiago v. Ethicon</u>, supra, pág. 849; <u>Rojas de Colón v. Méndez & Co.</u>, supra, pág. 54.

[205] <u>Cuevas Santiago v. Ethicon</u>, supra, pág. 849, citando el Art. 14 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 14.

discurrir el término del derecho a la reserva de empleo.[206] De acuerdo al texto de la Sec. 5-A de la Ley Núm. 45, *supra*, un patrono deberá reservarle el empleo a un empleado que sufre un accidente ocupacional, por un término de 12 meses, *a partir del momento en el cual ocurrió el accidente*.[207]

Por su parte, la Sec. 5 de la Ley de Protección Social por Accidentes de Automóviles, *supra* -al igual que la Sec. 3 de la Ley de Beneficio por Incapacidad Temporal, *supra*, y el Art. 16 de la Ley de Seguro Social para Choferes y otros Empleados, *supra*- provee que el término de reserva de empleo -6 meses en el caso de la Ley Núm. 138, *supra*- empieza a transcurrir desde el *momento en que comienza la incapacidad del empleado*.[208] Dicha diferencia exige que abordemos el significado del término *incapacidad*, según provisto por la Ley Núm. 138, *supra*, para así conocer cuándo se activa el derecho a la reserva de empleo, al igual que su corolario, el derecho a la reinstalación. Veamos.

Según la Sec. 2 del citado estatuto, *incapacidad* "es aquella de tal naturaleza que impida a la víctima *en forma total y continua* dedicarse a cualquier empleo u ocupación para el cual esté capacitada por educación, experiencia o entrenamiento".[209] El Reglamento para la Ley de Protección

---

[206] Cuevas Santiago v. Ethicon, supra, págs. 851-852.

[207] 11 L.P.R.A. sec. 7.

[208] 9 L.P.R.A. sec. 2054(3)(b).

[209] (Énfasis nuestro.) 9 L.P.R.A. sec. 2052(9).

Social por Accidentes de Automóviles de la ACAA (el Reglamento), en su Regla 2(Q), expande dicha definición, añadiendo que aquellos

[i]ntentos de regresar al trabajo cotidiano dentro de un término de tres meses no demostrarán, *necesariamente*, que la incapacidad cesó; sin embargo, mientras más extenso sea el periodo, siempre dentro del término de tres meses, más robusta deberá ser la prueba que derrote *la presunción de que cesó la incapacidad.*[210]

En primer lugar, al exigir que la incapacidad sea *total y continua*, la Ley de Protección Social por Accidentes de Automóviles, *supra,* presume que la incapacidad del trabajador lo inhabilita para desempeñarse adecuadamente en sus labores y por tal motivo *no puede asistir a su empleo*, siempre y cuando dicha *ausencia* sea una debidamente autorizada por la ACAA.[211] *A contrario sensu,* lo anterior denota que cuando el empleado puede retornar a su trabajo luego de su accidente, aún mientras recibe tratamiento médico por sus lesiones, éste no se

---

[210] (Énfasis nuestro.) Reglamento Núm. 6911 de la ACAA, aprobado por el Departamento de Estado el 1 de diciembre de 2004, Regla 2 (Q), pág. 5.

[211] A. Acevedo Colom, Legislación Protectora del Trabajo Comentada, San Juan, 7ma. ed., Ed. Ramallo Printing Bros., 2001, pág. 165 ("Esta ley establece una reserva de empleo de seis meses para todo trabajador que sufra un accidente de tránsito, *por esta razón se ausente de su empleo* y esté cubierto por ley"). (Énfasis nuestro.) Véanse, también: Rodríguez Rosa v. Méndez & Co., supra, págs. 742-743; Cuevas Santiago v. Ethicon, supra, págs. 854 y 856 (Opinión Disidente emitida por el Juez Asociado Señor Fuster Berlingeri) ("Es precisamente porque del accidente... el empleado ha resultado tan lesionado que tiene *que ausentarse* del trabajo, que se le ofrece al empleado la protección del artículo [5]"). (Énfasis nuestro.)

encuentra incapacitado *total y continuamente*, y, por ende, tampoco goza de las protecciones instauradas por la Sec. 5 de la Ley Núm. 138, *supra*.[212]

Cónsono con lo esbozado, el punto determinante para el cómputo del término de reserva de empleo provisto por la Sec. 5 de la Ley Núm. 138, *supra*, dependerá, esencialmente, de la determinación que emita la ACAA con relación a la incapacidad sufrida por el empleado, y si dicha incapacidad le impide de forma total y continua asistir a su trabajo para desempeñar sus tareas y deberes. Una vez dicha agencia concluye que la víctima del accidente vehicular está incapacitada, en ese momento se activa el derecho a la reserva, al igual que el derecho a la reinstalación. Ello, pues, la determinación que emita dicha agencia merece nuestra más alta deferencia, por ser ésta la que posee la pericia necesaria para determinar qué lesiones incapacitan total y continuamente a un empleado, según la ley que administra.[213]

No obstante, dicha determinación no es absoluta. Como bien expusimos anteriormente, la Regla 2(Q) del Reglamento

---

[212] Arribamos a dicha conclusión mediante un ejercicio analógico con la Sec. 5-A de la Ley de Compensaciones por Accidentes de Trabajo, *supra*, y nuestros pronunciamientos en Rodríguez Rosa v. Méndez & Co., supra, pág. 743. En Rodríguez Rosa v. Méndez & Co., supra, articulamos lo siguiente:

"para que sea aplicable [la Sec. 5-A], *el obrero debe haber estado inhabilitado para trabajar y su ausencia autorizada por el Fondo*. Cuando dicha Corporación, *por el contrario*, determina que un empleado puede regresar a trabajar, con derecho a recibir tratamiento médico durante horas laborables, o sea bajo 'C.T.' y no 'en descanso', el empleado no está autorizado a ausentarse bajo circunstancias normales". (Énfasis en el original). *Cf.* Rivera v. Blanco Vélez Stores, supra.

[213] Rodríguez Rosa v. Méndez & Co., supra, págs. 744-745; Torres González v. Star Kist Caribe, Inc., supra, pág. 1035.

previamente citado establece que los intentos posteriores de un empleado por regresar a su empleo -dentro de un término de tres meses- no *necesariamente* derrotan la determinación de incapacidad hecha por la ACAA. Ahora bien, dicha disposición legal también reconoce que *tales intentos sí activan una presunción de que la incapacidad ha cesado.*[214] La fortaleza de esa presunción, según el Reglamento, dependerá de cuánto tiempo ha transcurrido del periodo de tres meses posteriores a la determinación de incapacidad.[215] Mientras más tiempo haya pasado, más robusta deberá ser la prueba que articule el empleado para derrotar la presunción de que su incapacidad ha cesado. Por el contrario, mientras menos tiempo haya transcurrido con relación a los tres meses indicados, menor será la fuerza de la presunción señalada.

Teniendo presente el marco jurídico aplicable al caso ante nos, pasemos a resolver las controversias inicialmente esbozadas.

III.

*A. El contrato del señor Whittenburg no era uno por tiempo determinado bona fide.*

En su petición de *certiorari*, el señor Whittenburg Guzmán arguyó que el Tribunal de Apelaciones había errado al resolver que su contrato era uno por tiempo determinado

---

[214] Reglamento Núm. 6911, *supra*, Regla 2 (Q), pág. 5.

[215] Íd.

*bona fide* el cual no estaba protegido por la ley Núm. 80, *supra*. Le asiste la razón.[216]

Luego de examinar el contrato laboral del peticionario, encontramos que éste era uno por *tiempo determinado*, el cual vencía y era renovado de año escolar en año escolar, según las altas y bajas en la matrícula estudiantil del Colegio, y de acuerdo a las necesidades docentes que tales cambios implicaban.[217] Como contrato por tiempo determinado, el Art. 1 de la Ley Núm. 80, *supra*, establece que su mero título no lo exime de quedar sujeto a la presunción de despido injustificado impuesta por la Ley Núm. 80, *supra*.

A raíz de ello, el Colegio sólo podía rebatir dicha presunción si establecía lo siguiente: (1) que la práctica y circunstancias involucradas u otra evidencia en la contratación no crearon una expectativa de continuidad de empleo; y (2) que el contrato de término cierto o para un proyecto u obra cierta, era uno de naturaleza *bona fide*. Con relación a este segundo criterio, el patrono debía constatar, además, que el referido contrato: (1) se emitió por escrito; (2) en o antes del primer término o jornada de trabajo del empleado; y (3) que fue otorgado con el propósito *-y así se hizo constar-* de (a) sustituir durante

---

[216] De entrada, expresamos nuestra conformidad con aquellas partes de la opinión mayoritaria que articulan que el señor Whittenburg no era un contratista independiente, según dicho término ha sido definido por nuestra jurisprudencia, y que su primer contrato, al disponer de un periodo probatorio de un semestre, violentaba el Art. 8 de la Ley Núm. 80, *supra*, 29 L.P.R.A. sec. 185h. Véase, en lo pertinente, Parte II de la Opinión Mayoritaria.

[217] Apéndice XVIII, Petición de *certiorari*, págs. 20 y 23.

su ausencia a un empleado en el uso de licencia establecida por ley o por el patrono, (b) llevar a cabo tareas extraordinarias o de duración cierta, tales como –a modo de ejemplo– los inventarios anuales, la reparación de equipo, maquinaria o las facilidades de la empresa, el embarque o desembarque casual de carga y el trabajo en determinadas épocas del año como Navidad, o (c) para cumplir con las órdenes temporeras de aumentos de producción y cualquier otro proyecto o actividad particular de corta duración o de duración cierta fija.

Al examinar el contrato laboral otorgado el 14 de noviembre de 2002 entre el peticionario y el Colegio, cuya vigencia expiraba el 30 de junio del año siguiente, encontramos que éste no creó en el señor Whittenburg una expectativa legítima de continuidad en el empleo. Según la práctica y circunstancias involucradas, todo personal que contrataba con el Colegio estaba al tanto que los cambios en la matrícula de estudiantes, de año en año, aumentarían o disminuirían el número de recursos humanos con los cuales el Colegio debía disponer para cada año escolar. Esa realidad legitimaba la otorgación de contratos por periodos fijos de un año escolar, ya que, de no ser así, una vez aumentara o se redujera la matrícula de estudiantes, el Colegio estaría atado a un número fijo de maestros o personal el cual podría no ser proporcional a la demanda académica que enfrentaba.

A la luz de lo anterior, una vez otorgados los contratos anuales, cada empleado poseía una expectativa

legítima a que dicho contrato fuese honrado *sólo durante la vigencia del mismo*; entiéndase, un año escolar. Cualquier renovación posterior no era de carácter mandatorio, sino que estaba íntimamente atada al aumento o la reducción de la matrícula de estudiantes, según ésta fuese cambiando de año en año. Así, el señor Whittenburg Guzmán, durante el año escolar 2002-2003, *sólo poseía una expectativa legítima de continuidad en el empleo desde el 14 de noviembre de 2002, hasta el 30 de junio de 2003. No más.*

Habiendo establecido que el peticionario no poseía una expectativa legítima de continuidad en el empleo más allá del año escolar por el cual fue contratado, procede determinar si el contrato de empleo por tiempo determinado del señor Whittenburg Guzmán era uno *bona fide*. Luego de examinar los hechos que nos atañen a la luz de los criterios esbozados en <u>López Fantauzzi v. 100% Natural</u>, *supra*, encontramos que el contrato bajo examen no es uno por tiempo determinado *bona fide*. Veamos.

A pesar de que el pacto laboral firmado entre el peticionario y el Colegio fue emitido por escrito, éste no fue otorgado en o antes del primer término o jornada de trabajo del empleado. Ello, pues, aunque el peticionario comenzó a brindar sus servicios el 8 de agosto de 2002, no fue sino hasta el 14 de noviembre del mismo año —casi 100 días luego de su primera jornada de trabajo— que el acuerdo de empleo fue suscrito entre las partes. Igualmente, el contrato no consignaba expresamente alguno

de los propósitos para los cuales puede otorgarse un contrato a término fijo *bona fide*, según es exigido por el Art. 11 de la Ley Núm. 80, *supra*.

*B. El despido del señor Whittenburg fue injustificado.*

Según el Art. 2 de la Ley Núm. 80, *supra*, un patrono podrá despedir *justificadamente* a un empleado, si se configura una de las siguientes causales: (a) que el obrero siga un patrón de conducta impropia o desordenada; (b) la actitud del empleado de no rendir su trabajo en forma eficiente, o de hacerlo tardía y negligentemente, o en violación de las normas de calidad del producto que se produce o maneja por el establecimiento; (c) la violación reiterada por el empleado de las reglas y reglamentos razonables establecidas para el funcionamiento del establecimiento, siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado; (d) el cierre total, temporero o parcial de las operaciones del establecimiento; (e) los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público; y (f) las reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido.[218]

En el caso de marras, cuando los funcionarios de la Administración del Colegio fueron cuestionados sobre los

---

[218] 29 L.P.R.A. sec. 185b.

motivos por los cuales despidieron al señor Whittenburg Guzmán, éstos se limitaron a contestar que no existía una razón particular para su determinación y que la mera expiración del término contractual justificaba su decisión. Al preguntársele si en alguna ocasión anterior el peticionario había sido evaluado, disciplinado o amonestado, los testigos del Colegio contestaron en la negativa. En ningún momento alegaron o comprobaron alguna de las causales esbozadas por el Art. 2 de la Ley Núm. 80, *supra*.

Ante tal realidad fáctica, resulta forzoso concluir que el patrono no logró articular una razón legítima que rebatiera la presunción de despido injustificado que pesaba en su contra. Como resultado, el Colegio deberá responderle al peticionario mediante el pago de la mesada, según lo regula la Ley Núm. 80, *supra*. Por tal motivo, devolvería el expediente al Tribunal de Primera Instancia para que adjudique la cuantía a ser indemnizada por concepto de mesada. Atendido lo anterior, réstanos examinar si procede la causa de acción del peticionario al amparo de la Ley Núm. 138, *supra*.

*C. El señor Whittenburg no tiene una causa de acción al amparo de la Ley Núm. 138, supra.*

Finalmente, el peticionario arguye que el Tribunal de Apelaciones erró al determinar que el patrono no violentó su derecho a la reserva de empleo y a la reinstalación, según están proscritos en la Sec. 5 de la Ley Núm. 138, *supra*. No le asiste la razón.

Como bien establecimos en la exposición del derecho, la Sec. 5 del citado estatuto le reconoce al empleado lesionado por causa de un accidente de tránsito dos derechos fundamentales: (1) el derecho a que el patrono le reserve su empleo por un término de 6 meses mientras se ausenta de su trabajo para lograr una adecuada recuperación; y (2) el derecho de solicitar su reinstalación en el puesto que dejó vacante, una vez constate su cumplimiento con ciertos requisitos estatutarios. Según discutimos, para que el empleado pueda acogerse a las protecciones delineadas, éste deberá acreditar lo siguiente: (1) que estaba empleado al momento de sufrir su incapacidad; (2) que la incapacidad lo inhabilitó para trabajar; (3) que se acogió a los beneficios provistos por la Ley Núm. 138, *supra*; (4) que dentro de los 15 días siguientes a haber sido dado de alta definitivamente y autorizado a trabajar por la ACAA, solicitó a su patrono su reinstalación en su antiguo puesto; (5) que dicho requerimiento de reposición se hizo dentro de los 6 meses de haber sufrido la incapacidad; (6) que al solicitar su reposición estaba física y mentalmente capacitado para desempeñarse en las funciones del empleo que ocupaba; y (7) que dicho empleo subsistía al momento en que solicitó su reinstalación. Apliquemos los factores delineados al caso ante nos.

En primer lugar, el señor Whittenburg, al momento de sufrir su incapacidad, se encontraba empleado por el Colegio. Esto ha quedado claramente establecido a la luz

de nuestra determinación de que el peticionario, por la naturaleza de sus contratos de empleo, era un empleado protegido por la Ley Núm. 80, *supra*.

Segundo, el 30 de junio de 2003, la ACAA determinó que el señor Whittenburg, por causa de las lesiones sufridas en su accidente de motora, estaba incapacitado desde el 15 de junio de 2003 -fecha del accidente- hasta el 15 de agosto del mismo año.[219] Otorgándole deferencia a la determinación efectuada por la ACAA -la agencia que administra la Ley Núm. 138, *supra*- presumimos que dicha incapacidad fue total y continua durante el término decretado por el cuerpo administrativo, según lo requiere la Sec. 2 del citado estatuto. Tercero, el récord constata que el señor Whittenburg Guzmán se acogió a los beneficios provistos por la Ley Núm. 138, *supra*.

Finalmente, al ser despedido durante el periodo decretado para su incapacidad, esto es, antes del 15 de abril de 2011, el señor Whittenburg Guzmán no estaba obligado a solicitar su reinstalación. Ello se debe a que, como bien establecimos en nuestra exposición del derecho, cualquier despido efectuado sin justa causa, antes de la ACAA dar de alta al lesionado y autorizarlo a trabajar, representa un despido ilegal el cual violenta el periodo de reserva de empleo. Una vez despedido durante el tiempo de reserva, resulta innecesario evaluar si el peticionario cumplió o no con los requisitos 4 al 7 antes

---

[219] Véase, Apéndice VI, Petición de *Certiorari*, pág. 33.

mencionados, ya que tales factores sólo deben ser considerados una vez el empleado es elegible para solicitar la reinstalación.

Ahora bien, esta conclusión no dispone de la controversia ante nos. En el caso de autos, la prueba desfilada en el juicio demostró que el sacerdote Morell Domínguez -persona encargada de tomar la decisión final con relación al despido del señor Whittenburg- desconocía que el peticionario estaba acogido a los beneficios de la Ley Núm. 138, *supra*. Aunque ciertamente reconocemos que dicho estatuto nada dice sobre la correlación que pueda existir entre el conocimiento o desconocimiento del patrono sobre tal hecho y su responsabilidad o falta de ella con relación a la violación de los derechos del empleado al amparo de la Sec. 5, *supra*, entendemos necesario establecer algunas consideraciones que no deben ser pasadas por alto al resolver la controversia que nos ocupa. Veamos.

En primer lugar, nuestro ordenamiento legal está gobernado por el principio rector de la *buena fe*. Como resultado, nuestro sistema de derecho exige que "el desenvolvimiento de las relaciones jurídicas, el ejercicio de los derechos y el cumplimiento de las obligaciones, se produzca conforme a una serie de principios que la conciencia jurídica considera necesarios, aunque no hayan sido formulados".[220] Así, las partes en cualquier relación jurídica están llamadas a brindarse especial lealtad,

---

[220] Véase, B.P.P.R. v. Sunc. Talavera, 174 D.P.R. 686, 696 (2008).

quedando obligadas a revelarse mutuamente toda información pertinente a dicha relación jurídica, mediante el empleo de una razonable diligencia.[221]  El comportamiento de todo operador del derecho ha de adaptarse a la referida regla de conducta.[222]  Por tal motivo, cuando un empleado oculta a su patrono que se ha acogido a los beneficio de la Ley de Protección Social por Accidentes de Automóviles, *supra,* su actuación carece de buena fe y lesiona los principios fundamentales de nuestro ordenamiento jurídico.

En segundo plano, el conocimiento que un patrono tenga sobre el hecho de que su empleado se ha acogido a los beneficios de la Ley Núm. 138, *supra*, ilustra mucho sobre la intención de éste al momento de efectuar el despido.  Como bien articulamos anteriormente, la razón primordial del derecho a la reserva de empleo consiste en evitar que el patrono despida al empleado por motivo de su *incapacidad inhabilitante*, *total y continua*, mientras éste se ausenta del trabajo para lograr su pronta recuperación. Según lo delineado hasta el momento, la incapacidad de un obrero que activa el derecho a la reserva de empleo, encuentra su génesis cuando la ACAA así lo determina. Mientras dicha determinación no se haya efectuado, el patrono aún no queda obligado por los derechos que amparan al empleado lesionado.

---

[221] Véase, <u>Ortiz Brunet v. El Mundo</u>, 169 D.P.R. 332, 343 (2006).

[222] Véase, M. A. del Arco Torres & M. Pons González, <u>Diccionario de Derecho Civil</u>, Pamplona, Ed. Aranzadi, T. 1, 1984  págs. 179-180.

Tomando en consideración lo esbozado, podemos concluir que, cuando un patrono despide a un empleado sin conocer que éste se ha acogido a los beneficios de la Ley de Protección Social por Accidentes de Automóviles, *supra, y que ha sido declarado incapaz por la ACAA*, el patrono también desconoce que la reserva de empleo ha sido activada. Al desconocer tal información, el despido no ha sido configurado con la intención de violentar la política pública expuesta por la Ley Núm. 138, *supra*, ya que el patrono no está al tanto de la determinación de incapacidad efectuada por la ACAA. Por tal motivo, al no existir por parte del patrono la intención de despedir al empleado por motivo de su incapacidad, no cabe hablar de una violación al estatuto reseñado.

Por todo lo anterior, soy del criterio que el desconocimiento del Colegio de que el señor Whittenburg Guzmán se había acogido a los beneficios de la ley Núm. 138, *supra*, previo a notificarle el despido, evidencia que la acción del patrono no fue efectuada con la intención de violar la reserva de empleo y evitar que el trabajador se recuperara satisfactoriamente. Ante tal conclusión, y por fundamentos distintos, confirmaría al Tribunal de Apelaciones, el cual denegó la causa de acción del peticionario al amparo de la Sec. 5 de la Ley Núm. 138, *supra*.

IV.

A la luz de lo aquí expuesto, concurro con la opinión mayoritaria en cuanto a su determinación de que el despido

del peticionario fue uno injustificado. Como resultado, devolvería el expediente al Tribunal de Primera Instancia para que se adjudique la cuantía del pago de la mesada, según ésta es regulada por la Ley Núm. 80, *supra*.

No obstante, disiento de la mayoría en cuanto a su conclusión de que el peticionario sufrió una violación de su derecho a la reserva de empleo y que, por ende, procede su reinstalación al amparo de la Ley Núm. 138, *supra*. Entiendo que el desconocimiento del patrono del hecho de que el empleado estaba acogido a los beneficios del estatuto citado, representa una defensa afirmativa a su favor. Consecuentemente, denegaría dicha causa de acción, así como todo remedio concedido por la Sec. 5 de la referida legislación. Ante esa determinación, el peticionario sólo tiene derecho al pago de la mesada, sin más.

Edgardo Rivera García<br>
Juez Asociado